**Richard B. AUMILLER, Plaintiff,**

v.

**The UNIVERSITY OF DELAWARE et al., Defendants.**

**Civ. A. No. 76–84.**

United States District Court,
D. Delaware.

June 21, 1977.

Sheldon N. Sandler, of Bader, Dorsey & Kreshtool, Wilmington, Del., for plaintiff.

John P. Sinclair and James F. Burnett, of Potter, Anderson & Corroon, Wilmington, Del., for defendants.

MURRAY M. SCHWARTZ, District Judge.

Plaintiff, Richard B. Aumiller ("Aumiller"), a nontenured "Lecturer" [1] at the University of Delaware ("University") during

---

1. The designation "Lecturer" applies to visiting faculty and individuals holding special appointments. A person holding the position of Lec- turer is not eligible for tenure at the University. (Trial Transcript ("Tr.") at 221, 615–16).

the 1974–75 and 1975–76 academic terms,[2] has brought a civil rights action under 42 U.S.C. § 1983 against the University of Delaware, the Board of Trustees of the University and a number of University officials and administrators. The individual defendants include Edward A. Trabant ("Trabant"), President of the University; Samuel Lenher ("Lenher"), Chairman of the Board of Trustees; L. Leon Campbell ("Campbell"), Provost and Vice President for Academic Affairs; George H. Gibson ("Gibson"), Assistant Provost; Helen Gouldner ("Gouldner"), Dean of the College of Arts and Science; and Brian Hansen ("Hansen"), Chairperson of the Department of Theatre of the College of Arts and Science. The individual defendants are sued both in their official and individual capacities with the exception of Assistant Provost Gibson and Dr. Hansen, who are sued solely in their official capacities. The gravamen of plaintiff's complaint is that defendants violated his First Amendment rights of free expression and association by refusing to renew his contract for the 1976–77 academic term based on his statements on the subject of homosexuality appearing in three newspaper articles.

Aumiller's original complaint in this action was filed on February 19, 1976. In addition to the First Amendment claim, the original complaint also contained two contract claims corresponding to two of the grievances filed in the University grievance proceeding and a cause of action predicated on an alleged denial of procedural due process. Subsequently, with the consent of defendants, plaintiff filed an amended complaint on July 26, 1976, limited exclusively to claims under the First Amendment.[3]

In the amended complaint, plaintiff contended that the actions of defendants were taken in bad faith, under color of state law, and that defendants knew or should have known that their actions would and did deprive Aumiller of his well-established constitutional rights of free speech and association. By way of relief, plaintiff requested an injunction prohibiting defendants from hiring another person to fill his position [4] and requiring defendants to expunge all references to the incident from defendants' records and to make no reference to this incident in connection with employment inquiries. Plaintiff also has requested compensatory [5] and punitive damages and an award of attorney's fees. (Docket No. 28)

Defendants do not controvert the substance of Aumiller's allegations, but contend that their refusal to renew plaintiff's contract was justified under all the circumstances and did not infringe his First Amendment rights.

A trial was had in the above matter on September 13–17, 1976. Following completion of post-trial briefing and oral argu-

---

**2.** During his two year employment with the University, Aumiller taught only one course. (Docket No. 34, Pretrial Order; Stipulated Fact No. 20) His duties at the University were primarily administrative, including serving as Director of the University Theatre, supervisor of the Summer Festival of the Arts, and manager of the Performing Arts Series at the University. (Tr. at 62–64, 218)

**3.** The amended complaint was attached to a pleading denominated a Stipulation of Dismissal, in which the parties stipulated that the amended complaint would be substituted for the original complaint in this action, and that all claims in the original complaint *not contained* in the amended complaint were dismissed with prejudice. (Docket No. 28)

A Stipulation of Partial Dismissal subsequently filed on August 30, 1976, further narrowed the issues before the Court, by providing that "all claims in the amended complaint which relate to or grow out of plaintiff's alleged right to employment . . . as Manager/Director of the Summer Theatre and the Summer Festival of the Arts for 1976 . . . [are] dismissed with prejudice." (Docket No. 31)

**4.** Given the fact that the 1976–77 academic term commenced prior to trial, and is now over, plaintiff's prayer for relief will be treated as a request for reinstatement and back salary. *See* Plaintiff's Pre-Trial Brief at 62–71.

**5.** In addition to loss of salary, plaintiff asserted that he suffered emotional distress, embarrassment and humiliation.

ment, it is now ripe for decision. This opinion constitutes the findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

## I. THE FACTS

Aumiller first came to the University of Delaware in February 1972, as a graduate student in the Department of Theatre. (Tr. at 7) In 1973, he was employed part-time as an aide to Professor Lawrence Wilker, then Manager of the University Theatre. Dr. Wilker took a leave of absence the following academic year and recommended that Aumiller be hired as his replacement, which in fact occurred. (Tr. at 173–75) [6] Aumiller was rehired for the 1975–76 academic year when Dr. Wilker officially left the University to become permanent director of the Grand Opera House in Wilmington, Delaware.

About a month after Aumiller initially arrived at the University of Delaware in

---

6. As previously noted, Aumiller held the position of Lecturer.

7. The Gay Community is a homophile organization founded in 1971 at the University of Delaware. The organization was officially recognized by the University in the fall of 1972, upon satisfaction of a number of requirements (see Plaintiff's Exhibit ("PX")–13, Recognition Process for Student Organizations), including the filing of a constitution with the Dean of Students and the naming of a faculty advisor. Official recognition means that an organization can use University facilities and also confers eligibility to obtain funding from the University through the student government. The Gay Community received University funding for the placement of advertisements in the campus newspaper and for speakers. (Tr. at 12–14, 60)

Some controversy arose at trial over whether "official recognition" signified University approval of the organization. President Trabant testified that official recognition of the Gay Community came about solely because the University was advised by counsel that it legally could not refuse to do so. (Tr. at 315) However, one of the criteria governing approval is that the "goals and purposes [of the organization] are not in conflict with the objectives or policies of the University." (PX–13) Thus the Court concludes that the University in recognizing the Gay Community was satisfied that this criterion was met.

A five-fold purpose for the Gay Community is set out in its Constitution:

1972, he joined an organization called the Gay Community.[7] Aumiller is himself homosexual in sexual orientation and preference. As a graduate student he held no office in the organization. (Tr. at 9) However, shortly after he became a faculty member in September, 1974,[8] he was asked by members of the Gay Community[9] to serve as their faculty advisor, an invitation which Aumiller accepted. (Tr. at 20) Although the University requires every campus organization to have a faculty advisor, Aumiller's decision to serve in this capacity was purely voluntary. (Tr. at 22, 88)

### A. *The Sunday Bulletin Article* [10]

In late May 1975, a reporter from the Philadelphia Bulletin newspaper attended a Gay Community meeting. The reporter explained that he was doing a story on homosexuals in the State of Delaware (the Bulletin publishes a Delaware edition). While at the meeting he asked several questions and

---

"The first purpose is the education of the community concerning legal, social and personal aspects of homosexuality. The second is to raise the individual consciousness of the members towards an understanding of the position of a gay individual living in a 'straight' (non-gay) society. The third is to counsel any person having problems relating to homosexuality. The fourth is the education of the gay individual towards a viable lifestyle through social activities. The fifth purpose of the Gay Community is to represent the homosexual portion of the student body in matters relevant to the homosexual student." (PX–14)

8. When Aumiller was hired in 1974 both Dr. Hansen and Assistant Provost Gibson knew he was homosexual, but the other individual defendants did not. (Tr. at 175, 241)

Prior to his contract being renewed in September, 1975, President Trabant and Provost Campbell knew Aumiller was a homosexual by reason of a July 1, 1975, article in the Sunday Bulletin. *See infra.*

9. Throughout this Opinion the term "Gay Community" refers specifically to the officially recognized student organization at the University of Delaware and does not refer to the general homosexual population at the University or in Delaware.

10. The article is reprinted in its entirety *infra* at Appendix A.

took notes.[11] Aumiller had had no prior acquaintance with the reporter. (Tr. at 23–24, 26)

The article written by the reporter appeared in the July 1, 1975 Sunday Bulletin under the headline: "Gays Battle Prejudices, Keep Low Profiles." The article (PX–7) in two instances quoted statements made by Aumiller. It also excerpted a portion of a letter written by Aumiller in his capacity as faculty advisor to the Gay Community, to the United Campus Ministry.[12] (Tr. at 24–25)

The article opened with the following italicized quotation:

" '*What does teen-age America want to know about homosexuals?' asks Dick Aumiller, manager of the University of Delaware theater, as he and 20 other Delaware gays drink coffee in the basement of one of the school's dormitories.*

" '*They want to know if we are sick and if we can be cured,' he adds, relishing every cynical word that rolls off his tongue.*"

The concluding paragraph again quoted Aumiller:

" 'Well what if we could all be pupils [sic][13] for a day?' Aumiller mused. 'Maybe we are all in positions of power already. Pass legislation making it legal and we will see if it's really true.' "

The article in the Sunday Bulletin came to the attention of President Trabant shortly after its publication. Thereafter, President Trabant mentioned the article to Provost Campbell, suggesting that he contact Aumiller and explain to him that "his private life was his own business, but it had to be private, and if he did anything to cause embarrassment to the University that something would have to be done." (PX–15)

Provost Campbell testified that he asked Assistant Provost Gibson to speak to Aumiller, and that Gibson later reported back to him that he had talked to Aumiller, and that he thought Aumiller understood the situation. (Tr. at 678–80) Assistant Provost Gibson denies Provost Campbell ever told him to talk to Aumiller, and further denies later reporting back to Campbell. (Tr. at 242–43) Resolution by the Court of this factual discrepancy is unnecessary, for in any event it is clear that President Trabant's concerns over the first article were never communicated to Aumiller.

In August, 1975, one month after the first article had appeared, Aumiller was rehired for the 1975–76 academic term. His contract was signed by or on behalf of the President (Trabant), Provost (Campbell), Dean of the College of Arts and Science (Gouldner), and Chairman of the Department of Theatre (Hansen). (Tr. at 28; *see* Defendants' Exhibit ("DX")–3; DX–4)

## B. *The News Journal Article*[14]

In October 1975, Ms. Janice deBlieu, a "campus stringer"[15] from the Wilmington

---

**11.** Although not of record, Aumiller apparently authorized the use of his name in the article. Aumiller testified at trial that he did not read the article until November 1975. (Tr. at 27)

**12.** The letter to the United Campus Ministry concerned a problem encountered by the Gay Community in finding a meeting place. The United Campus Ministry had temporarily provided a meeting place, but stopped doing so when certain of its supporters objected.

Aumiller's letter is quoted as follows in the article:

"Dick Aumiller, faculty advisor to the gay community, termed it 'a responsible and non-violent group of young men and women whose chief concern is that of human rights.' He said, 'political or theological issues' should not prevent them from having a meeting place."

The article did not indicate that a letter rather than Aumiller's direct statement to the reporter was being quoted.

**13.** At his deposition Aumiller indicated that this word should be "purple." (Aumiller Dep. at 42)

**14.** The article is reprinted in its entirety *infra* at Appendix B.

**15.** As a campus stringer, Ms. deBlieu provided news tips to the News Journal and wrote occasional news and feature stories. DeBlieu had two years' experience with the News Journal newspapers, including full-time employment during the summer months. (Tr. at 374–75)

News Journal,[16] decided to research a possible article on the Gay Community at the University of Delaware. In order to contact a representative from the Gay Community, she called one of the numbers listed in an advertisement placed by the organization in the campus newspaper, the Review. Unbeknown to her, the number she dialed was the telephone number of Aumiller's residence. The person who answered the phone (who was not Aumiller) was unwilling to have his full name appear in a newspaper article on the Gay Community, but suggested that the reporter contact Aumiller. (Tr. 385–87) Ms. deBlieu subsequently interviewed Aumiller[17] at his on-campus office in Mitchell Hall,[18] and attended a Gay Community meeting. (Tr. at 34–36, 376–77, 387–88)[19] Following the interview and meeting, Ms. deBlieu twice telephoned Aumiller to ask some additional questions. During the first phone call, Ms. deBlieu also attempted to arrange for a photographer from the newspaper to take plaintiff's picture. Aumiller indicated to her that he was extremely busy, and had no time to pose for pictures during the day. He suggested, however, that if the photographer were present at play rehearsal that evening at the University Theatre, he perhaps could take Aumiller's picture then. (Tr. at 45)[20]

The actual interview and subsequent telephone conversations covered a variety of subjects relating to the Gay Community. Ms. deBlieu also asked Aumiller a number of questions concerning the views of homosexuals on certain issues. In response Aumiller indicated that he could not speak for all homosexuals, but could give only his own views. (Tr. at 54–55, 95–96) Aumiller showed no reluctance in speaking to Ms. deBlieu, nor did he try to discourage her in any way from using his name in the article. (Tr. at 390) Nevertheless, it is clear that the impetus for the article came exclusively from Ms. deBlieu and Aumiller did nothing to seek her out.[21]

As discussed more fully *infra*, the parties differ significantly over the impression the November News Journal article creates in the mind of a reader. What must first be addressed is whether Aumiller intended to create the impression that he was speaking for the University and whether that was Ms. deBlieu's understanding. Aumiller did not request that he be identified in any particular way in the article, although he knew the reporter was aware of his position

**16.** The News Journal Company publishes three papers. During the week, two papers are published daily—the Morning News and the Evening Journal. On Saturday and Sunday, a single paper is published, known as the News-Journal.

**17.** Ms. deBlieu told Aumiller when she first contacted him that the subject matter of the interview would be the Gay Community. (Tr. at 376)

**18.** Aumiller testified he suggested meeting at his office for reasons of convenience since Ms. deBlieu was a student at the University of Delaware. Moreover, he usually worked a 14-hour day, from 9:00 a.m.–11:00 p.m., thus making it difficult for him to meet her elsewhere. (Tr. 34–35)

**19.** It is not clear of record whether Ms. deBlieu interviewed Aumiller before or after the meeting.

**20.** The photographer did appear at the rehearsal that evening. Aumiller made sure that he was the only person in the photographs because "if there were students in the picture accompanying [an article on the Gay Community], people might assume that those students were in The Gay Community, and that wouldn't be fair because they weren't, so they should be kept out of the picture." (Tr. at 46)

DeBlieu at trial testified that during the course of the second conversation, Aumiller expressed concern about the photographer's statement to him that the article was *on him*. DeBlieu stated she assured Aumiller that the article was not on him, but was on the Gay Community, although she told him he would be quoted in the article. (Tr. at 384) While this particular testimony was favorable to Aumiller, he candidly stated he had no recollection of either the photographer telling him that the article was on him or of the subsequent clarifying conversation with Ms. deBlieu. (Tr. at 142–43)

**21.** In response to the question at her deposition whether Aumiller "welcomed" the opportunity to talk to her, Ms. deBlieu gave the following answer:

"THE WITNESS: No. He talked to me just like a normal conversation, you know. It wasn't like he had eagerly anticipated my arrival." (deBlieu Dep. at 11)

as a lecturer and his status as faculty advisor to the Gay Community. (Tr. at 36, 48) Aumiller also never specifically stated that he was expressing his views as a private citizen, rather than as an official spokesman for the University. (Tr. at 94) Likewise, he did not state that he was speaking on behalf of the University or expressing institutional policy. Aumiller testified that he intended to speak only as an individual, not as a University spokesman, except insofar as his dissemination of information on the Gay Community might constitute part of his responsibilities as the faculty advisor to that group. (Tr. at 44, 94) Aumiller explained that he did not state that he was speaking as an individual because he felt this was so obvious that it did not need to be specifically stated. (*Id.*) Ms. deBlieu was in no way misled as to the capacity in which Aumiller spoke. She unequivocally testified at her deposition and at trial that she perceived Aumiller to be speaking as a private citizen, not as an official University spokesman. (Tr. at 381, deBlieu Dep. at 30) [22] Thus, both participants in the interview fully agree that Aumiller neither intended to foster nor in fact fostered the impression that he was speaking as an official University spokesman. The Court adopts this as its finding, for defendants have been unable to produce any evidence, other than by reference to the article itself, that Aumiller intended to portray himself as an official spokesman. [23]

22. Ms. deBlieu had interviewed a number of other faculty members of the University, both in official and private capacities and not a single one had ever indicated to her in what capacity he was speaking. According to her, a reporter can tell from the context of the conversation in what capacity a person is speaking. She further testified that she saw no need for Aumiller to have specifically stated he was speaking as an individual. (Tr. at 378–79, 381)

23. *See infra* at pp. 1296–1297 for a discussion of the impression of Aumiller's authority to speak created by the News Journal article. The most suggestive aspects of the article—the headline and the caption accompanying the photograph—were both completely beyond the control of Aumiller and Ms. deBlieu.

24. The article is reprinted in its entirety *infra* at Appendix C.

## C. The Review Article [24]

In October, 1975, Aumiller was contacted by and spoke with two other reporters who worked for the Review, the student newspaper for the University of Delaware.[25] The reporters, Timothy O'Shea and Gwen Florio, wrote a two part article, the first portion of which appeared on November 4, 1975, and the second three days later on November 7, 1975. Aumiller was not mentioned either directly or indirectly in the second article.[26]

The November 4 article (PX–9)[27] dealt generally with the purposes of the Gay Community and the problems the organization had encountered in finding a meeting place. Aumiller was quoted three times in the article. The first quote dealt specifically with the problem in locating a suitable meeting place for the organization:

"The organization received official university recognition in 1972 by drafting a constitution and obtaining a faculty sponsor. According to the present faculty advisor, Richard Aumiller, director of the university theatre and summer arts festival, 'after receiving university recognition, the group continued to meet in private homes because the members preferred the casual, informal atmosphere. But last year, we decided to meet on campus in order to serve those students who don't have transportation.'

25. Aumiller first spoke to the reporters when they attended a Gay Community meeting. Thereafter, Mr. O'Shea met with Aumiller in Aumiller's office to complete the interview. (Tr. at 412–13) As in the case of the interview with Ms. deBlieu, Aumiller met with Mr. O'Shea at his office for reasons of convenience predicated on his work schedule and the fact that Mr. O'Shea was a University of Delaware student. (*See* Tr. at 34–35, 413)

26. The November 7 article profiled three or four unnamed homosexuals. Aumiller was not one of the individuals profiled. (Tr. at 419, 424; *see* PX–10)

27. The November 4 article carried a headline stating "Gays Seeking Campus Acceptance." The article was also denominated by a box containing the word "analysis." No picture accompanied the article.

"According to Aumiller, the Gay Community had difficulty finding appropriate space for campus meetings. 'Classrooms seemed very cold and institutional,' he said, 'so eventually we turned to United Campus Ministry (UCM) who had a meeting house on W. Park Place.' One of the pastors there agreed to the Gay Community's request and the group began meeting until their advertisements brought their presence to the attention of several congregations who support the UCM. The congregations threatened to withdraw their backing of the institution if gays were allowed to continue meeting there. 'This placed the UCM in a very embarrassing spot,' said Aumiller, 'so they told us to find another place to meet.'"

The second quotation followed a brief explanation of certain slang terms commonly used by homosexuals:

"People in the Gay Community, like other groups, have developed a language of their own. For instance, a 'Queen' is an effeminate man, 'straights' are heterosexuals, and 'cruising' means to go out looking for sex. In addition, much gay speech becomes a humorous satire on the attitude held about them by heterosexual society. Aumiller explained 'a certain amount of sexual banter is normal. Minority groups tend to indulge themselves in a certain amount of friendly deprecatory humor as a release.'"

The third and final quote dealt with the evolution of the goals of the organization:

"'Originally our efforts were very much concerned with raising our own group consciousness,' said Aumiller. 'Now, since we have been successful at that . . . our efforts are concentrated on raising the public's consciousness.'"

As in the case of the interview with Ms. deBlieu, Mr. O'Shea [28] testified that Aumiller did not specifically state that he was speaking as an individual or faculty advisor to the Gay Community or that he was not speaking as an official University spokesman. (Tr. at 415) Similarly, Mr. O'Shea testified it was very clear to him that Aumiller was speaking as an individual or in some instances as the faculty advisor to the Gay Community, and in no instance was he speaking as an official University spokesman. (Tr. at 415–16) [29] It is concluded Aumiller in speaking with Mr. O'Shea (and Ms. Florio) did not purport to act as a spokesman for the University of Delaware. Rather, he spoke to O'Shea as an individual and, where applicable, as faculty advisor to the Gay Community.

The November 2 News Journal article by Ms. deBlieu set in motion a series of events which eventually formed the basis for this litigation. These events perhaps can be analyzed most productively by focusing on the three most demonstrable responses by the administration, especially President Trabant: (1) the meeting between Trabant and Aumiller on November 4, 1975; (2) the decision by Trabant on December 22, 1975, not to sign a new contract for Aumiller if one were presented; (3) the decision by Trabant in May, 1976, to reject Aumiller's grievance petition. It is important to note at each of these stages the opinions and justifications which form the basis for the decisions taken. Perhaps more significantly, the Court finds clear and specific subtle and not so subtle changes in those justifications as the drama was played out from November, 1975, to May, 1976.

### D. The Meeting of November 4, 1975

After reading the November 2 News Journal article, President Trabant dictated a letter to Samuel Lenher, a defendant herein and Chairman of the Board of Trustees. (PX–15) That letter, dated November 4, 1975, is set out in full below:

"I was shocked to read the article in the Sunday paper about Mr. Aumiller

---

**28.** Mr. O'Shea was the primary author of the November 4 article. (Tr. 411, 418) Ms. Florio was not called as a witness by either party.

**29.** Mr. O'Shea also had interviewed a number of faculty members, none of whom had ever expressly indicated to Mr. O'Shea the capacity in which he spoke. (Tr. at 418)

who is employed by the University in the Department of Theatre. Speaking quite frankly, I really don't care what Mr. Aumiller does in his bedroom, but I consider it an effront [sic] to the University and to me as an individual that he insists in making his bedroom activities public information and a point of evangelistic endeavor to recruit more gays to his supposed cause.

"A few months ago there was an article in the paper treating in general the subject of gays in Wilmington. Mr. Aumiller was quoted in the article in which he said he was a gay. At that time I told the Provost to get with Mr. Aumiller to explain that his private life was his own business, but it had to be private and if he did anything to cause embarrassment to the University that something would have to be done. I now find that the Provost failed to carry through with my request.

"I feel that something must be done about Mr. Aumiller because he implies that the President knew of his gayness when he was hired. This is not the case. Becoming an advocate and evangelist for gays, he will naturally attract others to the campus to be employed, to hang around or to be students. Therefore, I feel that I have no other choice but to step in as President and attempt to correct the situation. *I am told that this is difficult and that if Mr. Aumiller wishes to bring suit that probably it will be quite a cause and that the chances of the courts upholding any action that I take are minimal. Nevertheless, I intend to proceed in the following way.* [Emphasis added]

"I have scheduled an appointment with Mr. Aumiller. I am going to tell him that as President of the University I am effronted [sic] by his statements and the signs which are in his office; that I had no knowledge that he was a gay when he was hired; that I really don't care what he does in his bedroom, but when he insists on making public information of it,

I find that shocking and of harm to the University. Therefore, his actions and statements must be extremely conservative and that his position at the University will be reviewed at the year's end to determine whether he will continue in our employ or not.

"If you have thoughts and advice on this matter, of course I would be very pleased to receive them."

On the same day Trabant summoned Aumiller to his office to discuss the News Journal interview and article. (Tr. at 579) Although Aumiller was not told the purpose of the November 4 meeting, he surmised the subject matter would be the article. After he had read the article, Aumiller had realized that some people might disagree with his statements and opinions, and that Trabant might take some "heat" as a result of the article. (Tr. at 144, Aumiller Dep. at 77) Trabant indicated at the outset of the meeting that they had something very serious to discuss, and remarked that what Aumiller did in his own bedroom was his business, but when he made it "a matter for the public press, then it unfortunately becomes my business." (Tr. at 47) Aumiller immediately presented his version of what had occurred.

Aumiller stated the article was misleading and inaccurate, adding that he thought it was unscrupulous for so much emphasis to have been placed upon his position at the University. (Tr. at 146–47, 840–41) Aumiller denied that the Gay Community actively campaigns to recruit new members (Tr. at 147), and stated that in talking to the reporter, he had made it clear that only Gibson and Hansen knew he was a homosexual when he was hired. (Tr. at 147) He further added that the "sex in a bathroom" quote was crude and was an unfair amalgam of his remarks. (Tr. at 148) Aumiller also pointed out other statements contained in the article which he felt had been taken out of context. Aumiller concluded by stating that he would not have a sexual relationship with anyone connected with the

**1284**

University, either a student or an employee. (Tr. at 584)[30]

When Aumiller finished speaking, Trabant advised him they were on a "conflict course" because the majority of Delawareans did not share his views on homosexuality, nor would they in his lifetime. (Tr. at 50) Aumiller asked the President point blank if the President wanted him to stop speaking out. (Tr. at 50–51) The President responded indirectly by saying that Delaware was "like a small pond, and a small wind can raise large waves on a small pond." (Tr. at 51, 657)[31]

Trabant concluded the meeting by stating that Aumiller's status would be reviewed at mid-year. (Tr. at 584) At this point there is a sharp divergence in the testimony. Trabant testified that as Aumiller was leaving, Aumiller said there was a "problem" because he had granted other interviews on the subject of homosexuality. (Tr. at 333, 584) Trabant agreed that this was a serious problem, and told Aumiller it cast doubt on the credibility of his opening remarks to the effect that the News Journal reporter had mislead and taken advantage of him. Trabant advised Aumiller to contact the reporter and attempt to prevent publication of the interview. (Tr. at 333–34, 584–85)[32] Aumiller stated no such conversation took place. He testified that the Review article was supposed to have been printed the prior week and when it did not appear, he assumed a decision had been made not to print it. (Tr. at 58; see Tr. at 416) When he returned to his office following the con-

ference with Trabant, Aumiller's secretary was holding a copy of the Review article. (Tr. at 56)

Thereafter, Aumiller conferred with Assistant Provost Gibson about the meeting. Gibson informed him that such a meeting with the President was extremely unusual and was indicative of a very serious matter. He advised Aumiller that he should grant no more interviews. Aumiller informed Gibson a few days later that he had decided to follow Gibson's advice. (Tr. at 65–68) On November 8 or 9, after returning from an out of town trip, Trabant read the article in the November 4 Review article in which Aumiller had been quoted. (Tr. at 585)

In summary, the Court finds that in light of the letter to Lenher and the conversation with Aumiller, as of November 4, 1975, three major themes guided Trabant's response to the July Bulletin and November News Journal articles: (1) his concern that Aumiller's "evangelistic endeavor" would attract homosexuals, both students and others, to the campus; (2) his concern that Aumiller's statements would cause "harm and embarrassment" to the University; (3) his belief that Aumiller's statements were "shocking" and an "effront" [sic] to him, personally, and to the University.[33]

**E.** *The Decision Not to Renew Aumiller's Contract*

At a meeting with Provost Campbell on December 10, 1975, little more than one

---

**30.** Aumiller did not qualify the word relationship. In light of all of the facts and circumstances surrounding the statement, however, the unmistakable reference was to a sexual relationship.

**31.** Trabant testified to the best of his recollection that the simile prefaced further remarks to the effect that Delaware had only one state university and that the University must attempt to maintain an environment in which all citizens will feel comfortable. Thus, if a Delawarean does not wish to attend the University because of an unacceptable environment established or tolerated by the administration, he may be effectively denied the opportunity of a university education, unless he has the substantial resources necessary to attend an out-of-state school. (Tr. at 323–24, 583, 661)

**32.** Neither Aumiller nor Trabant then were aware that the Review article in which Aumiller was quoted had been released around the time they were meeting.

**33.** It is noted in passing that the word "effront," used by Trabant in his letter to Lenher, was found in only one dictionary and that dictionary, the New Oxford English Dictionary, identified it as a verb and gave a definition inappropriate to the context of Trabant's letter. III A New English Dictionary pt. 2, at 55 (J.A.H. Murray ed. 1897). Accordingly, the Court surmises that the President intended to use the word "affront."

month after the meeting with Aumiller, President Trabant told the Provost that he would not sign a contract for Aumiller for the 1976-77 academic term, if one were presented to him. (Tr. at 274-75, 682)[34] On the following day the Provost related to Dean Gouldner the statement of President Trabant and gave as the reason for the decision the fact that "Aumiller had placed himself in a position of advocacy of the homosexual lifestyle for the undergraduate." (Tr. at 683) At a December 16 meeting among President Trabant, Provost Campbell and Dean Gouldner, Trabant reaffirmed his decision giving as his reason that Aumiller had placed himself in a "position of advocating a homosexual lifestyle for the undergraduate, that it would be confusing to a number of our undergraduates, and that in his opinion he had crossed over the area, that gray area between what one can say and what one cannot say in the academic community using one's position as a faculty member." (Tr. at 685)[35]

Thereafter, a conference was held on December 22, 1975, attended by Dr. Hansen, Dean Gouldner, Provost Campbell and President Trabant. Hansen, who opposed the President's decision, inquired about the sufficiency of the evidence that Aumiller's job performance had been affected. Trabant indicated that the issue at hand was not Aumiller's job performance, but that Aumiller had placed himself in a position of advocating "a homosexual lifestyle [for] the undergraduate and that he had used his position as a faculty member to expound this particular point of view and that this was not appropriate for him to do so." (Tr. at 689)[36] When Trabant did not waiver

from his decision, Provost Campbell renewed his suggestion that some alternate way to accomplish the same end be selected, i. e., a budgetary reason for not renewing Aumiller's contract. (Tr. at 359-60; Trabant Dep. 55-56) To his credit, President Trabant would not accede in this,[37] indicating that he had no desire to disguise the "true reason" for his decision.[38] (Tr. at 359-60, 731) Thus, by December 22, 1975, Trabant had made his decision not to renew Aumiller's contract, if it were presented for his signature.

If one compares the statements made by Trabant at his November 4 meeting with the reasons presented in December, there is a striking change in the focus of Trabant's concerns. Most obvious is the absence of any reference at the December meetings to the purported affront to the University and to Trabant by the newspaper articles. What previously had elicited such a strong reaction from Trabant in November apparently had faded into relative unimportance. Instead, primary emphasis was placed on the thesis that Aumiller had advocated experimentation with homosexuality for non-homosexual undergraduates (Tr. at 318-19) and therefore should not be rehired. The question of the legal sufficiency of Trabant's concerns is discussed *infra*, but the Court would be remiss if it did not comment on one of the President's conclusions. I cannot find a scintilla of evidence in any of the newspaper articles to support the inference that Aumiller was on a campaign to convert heterosexuals to homosexuality. The obvious and overwhelming point repeatedly made by Aumiller in the articles

---

34. This decision also applied to the contract for the 1976 Summer Festival of the Arts. (Tr. at 252; PX-16)

35. Provost Campbell at that time suggested using as an alternative explanation the inability to fund the position because of budgetary constraints. (Tr. at 685)

36. Hansen also voiced concern that the decision violated the principles of academic freedom and was not in the best interests of the University. (Tr. at 193-95)

37. The clear consensus of others at the meeting was that Trabant had made a firm decision not to renew Aumiller's contract. (Tr. at 203 (Hansen); Gouldner Dep. at 18-19)

38. A number of other items were then discussed including the question of academic freedom, and conjecture as to whether various segments of the University community would support the President's decision. Trabant also reflected on the fact that times had changed, for in the past the threat to disclose that a professor was homosexual was enough to force his resignation. (Tr. at 195-97)

was the need to improve the understanding and acceptance of homosexuals by society at large. The only statements that even remotely relate to Trabant's thesis are those suggesting that persons who have homosexual tendencies better serve themselves by admitting it to themselves and discussing it with others.[39] It is also important to keep in mind that between November 4 and December 22 the only additional information about Aumiller received by Trabant was the article in the campus newspaper discussed above.[40]

On January 5, 1976, Hansen orally advised Aumiller of Trabant's decision.[41] (Tr. at 72) The following day Hansen furnished Aumiller with a letter (PX–16) stating in part: "Dr. E. A. Trabant, President of the University of Delaware, has requested that I advise you of the following: Your present contract will not be renewed for the 1976-77 academic year."

On January 12, 1976, Trabant was contacted by a reporter from the News Journal about his decision not to renew Aumiller's contract. (Tr. at 603; PX–11) The following day an article appeared in the Morning News on Trabant's decision (PX–11),[42] in which Trabant is quoted as giving the following explanation for his decision:

"'The University does not normally comment on why contracts are not renewed. But to pretend to say that [the advocacy of homosexuality] was not the reason is wrong.

"'He placed himself in a position of encouraging, condoning and sanctioning homosexuality for the undergraduate . . . .'

"'When young students come to the University they may be unacquainted with various modes of sexual behavior. If they become mislead, thinking the university condones this, they are in error.

"'He has placed himself in a position of advocacy, and as President of this institution, I have to make it clear we don't encourage that. This will clarify our stand. If it goes to court, the issue will be further clarified.'

. . . . .

"'As an individual, I do not advocate homosexuality, and as an individual, I resent the bedroom behavior of university employees or others being portrayed in the public press. . . .'"[43]

### F. The Grievance Proceeding

In January 1976, Aumiller filed a three-part grievance under the Collective Bargaining Agreement between the University of Delaware and the Delaware Chapter of the American Association of University Professors (AAUP).[44] He contended: (1) that the University was required to provide

---

**39.** There is also a statement to the effect that the Gay Community "actively campaigns to recruit new members." However, this statement is not attributed to Aumiller and in fact did not come from Aumiller. (Tr. at 388) Moreover, recruitment is not synonymous with conversion, since the membership of the Gay Community is not restricted to homosexuals. (Tr. at 831; PX–14) Indeed, one court has indicated that the right of a homophile student university organization to recruit new members is directly protected by the First Amendment right of freedom of association. *See Gay Alliance of Students v. Mathews*, 544 F.2d 162, 165 (4th Cir. 1976).

**40.** The Court acknowledges that the "advocacy" justification articulated by Trabant in December portended the abuse of position justification reiterated so often by the President at trial.

**41.** Trabant at the December 22 meeting had offered personally to notify Aumiller of the decision. However, Hansen volunteered to do this because he knew Aumiller better. Trabant suggested that Aumiller be contacted right away, but Hansen said that he would prefer to wait until Aumiller returned to campus after the semester break. This was agreeable to the others. (Tr. at 196)

**42.** The article was titled "UD fires an avowed homosexual" and was written by Wally Judd.

**43.** A related article appeared in the Review on January 15, 1976, authored by Timothy O'Shea and entitled "Trabant Fires Gay Professor." (PX–12) Both Trabant and Gouldner are quoted in the article in defense of the decision not to renew Aumiller's contract. *See infra*, p. 1296, n.70.

**44.** The Collective Bargaining Agreement has not been made part of the record.

him with notice of non-renewal no later than December 15, 1975; (2) that Hansen's letter of January 6, 1976 was insufficient in its form because the University was required to give him a statement of reasons for the non-renewal; and (3) that the reasons for non-renewal violated the University's policy on "academic freedom" as set forth in the Faculty Handbook.[45] (*See* PX–23)

On March 12, 1976, following extensive hearings on the Aumiller grievance, the University's Arts and Science Senate Committee on Academic Freedom and Responsibility ruled in Aumiller's favor on all *three* grievances and recommended that he be given a one-year contract for the 1976–77 academic year, as well as a contract for the 1976 Summer Festival of the Arts. (PX–23)

Pursuant to the established grievance procedure, the faculty Committee's recommendation was forwarded to Dean Gouldner. In a written decision dated March 23, 1976, Gouldner expressed her disagreement with the Committee's findings, but nonetheless accepted its recommendation. Upon recommendation of the Department of Theatre, she signed a one-year appointment for Aumiller and a contract for the 1976 Summer Festival of the Arts. However, since this would have left Aumiller's status unsettled, she appealed the Committee's decision to the next level in the grievance procedure, the Provost. (PX–24)

In a written decision dated April 9, 1976, Provost Campbell held that all three grievances were without merit. (PX–28) In regard to Aumiller's grievance on the alleged violation of the University's academic freedom policy, Campbell stated:

"It is my judgment that Mr. Aumiller should have taken appropriate steps to correct or clarify the alleged misquotations and misrepresentations attributed to him and to have pointed out in unambiguous terms that in the interviews he was speaking as an individual and not as a University spokesman. His failure to do so is clearly not in keeping with the statement on academic freedom contained in the Faculty Handbook. . . ."

Aumiller appealed Campbell's decision to the next level in the grievance process, the University Appeals Committee. The University Appeals Committee concurred with the Senate Committee, ruled in Aumiller's favor on all three grievances and recommended Aumiller's reappointment for the 1976–77 school year. (PX–29)

The final step in the grievance process is the President of the University. The decision of the University Appeals Committee is only advisory to the President. President Trabant rejected the recommendation of the Appeals Committee and denied Aumiller's three grievances in a written decision dated May 24, 1976. (PX–30) After explaining why he did not feel that Aumiller's statements were covered by the principle of academic freedom, he opined that even if this were the case, Aumiller's actions were improper:

"Based upon all the evidence available to me, it is my opinion that Mr. Aumiller, through his actions and statements, indicated erroneously that the University . . . condones and sanctions homosexuality for undergraduates. As a private citizen, Mr. Aumiller has the right to advocate unpopular and controversial causes. But he has no right to use his position at the University to foster and promote what most Americans and most Delawareans consider an aberrant lifestyle.

"Turning to the Committee's other findings, I cannot agree that Mr. Aumiller made it clear on his interviews with the press that he was speaking as a private citizen. The published articles do not contain statements to that effect and instead highlight Mr. Aumiller's position at the University. Moreover, the statements attributed to Mr. Aumiller clearly imply that the University condones a homosexual lifestyle and endeavors to provide a hospitable atmosphere for homosexuals.

45. As noted *supra*, Aumiller filed the original complaint in this action in February, 1976.

"Finally, I cannot agree that Mr. Aumiller initiated adequate measures to correct what he contends were errors in the article in the *Wilmington Sunday News Journal,* of November 2, 1975. Mr. Aumiller brought some of these alleged errors to the attention of the reporter only when she contacted him more than two months after the publication of the article to solicit his response to my position concerning renewal of his contract.

"I recognize and respect the free speech rights of a faculty member as guaranteed by the First Amendment. Clearly, a faculty member should exercise his rights as a citizen, but in doing so he should be mindful of the interests of the University in maintaining public confidence in its ability to carry out the public duties which have been entrusted to it. In my opinion, Mr. Aumiller's actions and statements reflected adversely upon the University and tended to bring discredit to it." [46]

At trial Trabant testified that two additional factors were considered by him at this juncture, both of which were the product of this litigation.[47] The first was Ms. deBlieu's certainty in her deposition of April 23, 1976 that there were no errors in the quotes in the News Journal article and that Aumiller failed to state specifically that he was not speaking on behalf of the University. (Tr. at 591–92) The second factor concerned Aumiller's living arrangements and came to light during Aumiller's deposition in which he testified that he shared a house with two undergraduate students, both of whom were in the Department of Theatre, and one of whom was homosexual. (Tr. at 592–93) Trabant's decision was considered and approved by the Board of Trustees on May 27, 1976. (Tr. at 489; Defendant's Pre-Trial Brief at 16)

During this period from December 22 to May 27, the substantive rationale for the refusal to renew Aumiller's contract became more clearly defined and more precisely articulated. Review of various letters written by Trabant in January and February, 1976, to persons who opposed his decision (PX 17–21) and his written decision of May 24, 1976, demonstrates that by late January, 1976, the "advocacy" thesis used in the December meeting had been refined. These items reflect a distinct shift away from condemning Aumiller's merely making public his views and lifestyle and instead they concentrate on the use of his position as a member of the faculty in the service of a partisan cause.

The fundamental theme of Trabant's May 24 decision on Aumiller's grievance was that Aumiller abused his faculty position by granting newspaper interviews without expressly disavowing institutional authority. As a result, according to Trabant, readers were given the misleading impression that the University approves of a homosexual lifestyle. Further, Aumiller was able to use the stature and respect of the University to promote a personal cause. This justification also was articulated at trial by the President as the primary basis for his decision not to renew.

The Court has carefully reviewed the three newspaper articles which galvanized the President and other University officials into the actions at issue here. It is this Court's finding that there are only two places in the articles[48] that provide any support for the inference President Trabant apparently feels is so inescapable.

First, in each of the articles, Aumiller is identified as a lecturer and/or faculty ad-

---

**46.** Trabant "forwarded" the grievance to the Board of Trustees, along with Aumiller's contract. (PX–30)

**47.** *See infra* pp. 1298–1299 for a discussion of other factors that Trabant claims he knew about in December, 1975; but actually may not have known about until May, 1976.

**48.** The headline and caption accompanying the News Journal article also may be somewhat misleading, but, as noted *supra,* these were beyond the control of both Aumiller and Ms. deBlieu. Moreover, it is interesting to contrast the emphasis placed in the News Journal headline on gay activism with the headline accompanying the Bulletin article, which stresses the low profile maintained by homosexuals in Delaware.

visor to the Gay Community. But there is no statement by the interviewers or Aumiller that he is in any way speaking for the University. It has already been noted that in the specific cases of the November News Journal article and the Review article, that Aumiller did not intend and Ms. deBlieu and Mr. O'Shea did not believe that he was speaking for anyone other than himself, and at times, the Gay Community organization. Similarly, this Court finds that the most reasonable inference gained from reading all of the articles is that Aumiller was speaking as an individual and in specific instances, as a faculty advisor. In the context of the three articles, this Court finds meritless the contention that the mere identification of his position connotes University approval of whatever the lecturer says. Indeed, a reader is more likely to infer University approval of homosexuality from the University's official recognition of the Gay Community as a campus organization which is mentioned in the campus newspaper article.

The only other statement in any of the articles that can be construed as indicating University support of homosexuality is the assertion in the November News Journal article that "University officials knew Aumiller was gay when they hired him last fall." The reference to "last fall" can be understood to mean either the fall of 1975 when Aumiller's contract was renewed or the fall of 1974 when he was hired initially. If one adopts the former, then the statement in the News Journal article is true as to all the major administrators, for the Bulletin article publicizing Aumiller's homosexuality appeared in July, 1975. The likelier interpretation, and the one this Court adopts, is that "last fall" meant 1974, when he was first hired. The record is clear and uncontroverted that Hansen and Gibson were aware of his homosexuality in August, 1974, when he was hired; Trabant and other administrators did not know. Thus, to the extent one can construe the phrase "University officials" to include Trabant,

Campbell, and others, the phrase is misleading. Trabant, however, apparently also concluded that this inaccuracy creates the inference of University support and approval of homosexuality and misrepresents University policy. The Court disagrees for two reasons.

First, in the very next sentence Aumiller explains that by hiring him, the University demonstrated its willingness to treat him equally and not to assume that his sexual preference had an adverse effect on his work. Thus, Aumiller himself made clear that he interpreted the decision to hire him not as an endorsement of homosexuality, but rather as a concrete expression of "neutrality."[49]

Second, at trial, Trabant conceded that the plaintiff was not dismissed because of his homosexuality. (Tr. at 357) Nor does the record suggest that Aumiller would not have been hired if Trabant and others, in addition to Hansen and Gibson, had known he is a homosexual. Accordingly, this Court concludes that while the statement in the News Journal article is not as accurate as one would prefer as to who actually knew of Aumiller's homosexuality in August, 1974, it does not misrepresent what the policy of the University appears to be: to treat faculty applicants who are homosexuals the same as any other applicants.

Accordingly, this Court finds nothing in these newspaper articles to support the contention of the defendants that Aumiller abused his position at the University to create the inference that the University fully supported and encouraged those who adopt a homosexual lifestyle. The clear emphasis in each article is on an examination of how homosexuals adapt to life in a predominately heterosexual society. Aumiller appears as one example of a homosexual and his statements are directed towards educating readers of the article to an acceptance of homosexuals as equals and to the demythologization of certain stereo-

49. This is in fact the characterization advanced by defendants of the University's employment policy in regard to faculty members' sexual preferences. *See* Defendants' Post-Trial Brief at 11.

types commonly applied to homosexuals. The articles simply do not support the inferences suggested by the defendants.

Prior to addressing the merits of Aumiller's claim, two subsidiary matters must be resolved. The first involves ruling on evidentiary objections lodged at trial and argued in the post-trial briefs. The second concerns testimony presented at trial by two expert witnesses relating to homosexuality.

## II. EVIDENTIARY RULINGS

### A. *Defendants' Evidentiary Objections*

At trial, defendants objected to eight of the exhibits offered by plaintiff[50] and subsequently pursued their objections in their post-trial brief. These objections will be discussed seriatim.

■ Defendants first object to the admission of the Hansen deposition (PX–4) as hearsay. Although Dr. Hansen's sympathies may have been with the plaintiff, as a party defendant, his deposition testimony constitutes an admission, *see* F.R.Evid. 801(d)(2), and accordingly is admissible.[51]

■ Defendants next seek to bar as irrelevant the admission of PX–6, copies of the AAUP Statement of Principles and Interpretive Comments, and Statement on Extramural Utterances. Since the University of Delaware has not adopted this Statement of Principles (Tr. at 616), and the Statement of Principles does not supplant governing constitutional strictures, defendants' objection to PX–6 is sustained.

■ PX–18, PX–20 and PX–21 are all copies of letters opposing the University's decision sent to either Trabant or Lenher ("complaint letters"), accompanied in each case by a reply letter. The reply letters, authored by Trabant or Lenher, are clearly admissible as admissions, F.R.Evid. 801(d)(2) and defendants apparently have

not objected to them. The defendants do contend that the complaint letters which spawned the replies are irrelevant and constitute inadmissible hearsay. The hearsay objection is inapposite because the letters are not being admitted for the truth of the matter asserted, *see* F.R.Evid. 801(c). Further, the letters are relevant at least for the limited purpose of placing the reply letters in proper context. Accordingly, PX–18, PX–20 and PX–21 are admitted.

PX–22 is a letter from a member of the University of Delaware Administration to Lenher with an accompanying letter from students to members of the Board of Trustees in support of Aumiller. Both letters are inadmissible hearsay.

■ Defendants next object on relevant grounds[52] to the admission of PX–32, an "Open Letter" appearing in the News Journal on January 7, 1975 and signed by eighteen University faculty members denominated as "Concerned Faculty for Free Press." The Court finds this exhibit relevant to the question of the manner in which faculty at the University identify themselves when making public statements. It is therefore admissible.

■ Defendants finally object to PX–34, a copy of an article appearing in the Philadelphia Inquirer on the Aumiller non-renewal sent to Trabant on which were written obscene and scatological remarks. Although the comments of the sender clearly are not relevant, the Court holds the exhibit admissible as probative of the extent of written "reaction" to Trabant's decision.

### B. *Expert Witness Testimony*

■ At trial, both parties presented expert witness testimony relating to the etiology of homosexuality and its psychological implications. The testimony of the two men was for the most part not

---

**50.** Plaintiff apparently chose not to pursue any evidentiary objections in his post-trial brief, thereby abandoning them.

**51.** While the admissibility of the Hansen deposition has been ruled upon, it (as distinguished

from Dr. Hansen's trial testimony) has not been relied upon in formulating any of the findings of fact contained in this opinion.

**52.** Defendants have voiced no objection to PX–32 on either hearsay or authenticity grounds.

inconsistent.[53] However, at trial, I indicated that I was very uncertain that the medical testimony was in any way relevant to the constitutional questions herein presented.[54] (Tr. at 852–53) In their post-trial brief defendants contended that the medical testimony was relevant to the question of possible harm to students, if they were misled into believing that the University encouraged the adoption of a homosexual lifestyle for undergraduates.

The condition precedent to the Court's consideration of the testimony concerning potential harm to students is a finding that Aumiller willfully or recklessly created the false impression that the University encouraged undergraduate students to adopt a homosexual lifestyle. See generally Pickering v. Board of Educ., 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). As indicated more fully infra, defendants have failed to establish this fact. The mere assertion of a generalized, theoretical fear of adverse consequences inuring to students is insufficient to justify consideration of this evidence. As the Fourth Circuit explained in rejecting Virginia Commonwealth University's argument that it would deny registration as a student organization to the Gay Alliance of Students on grounds that affiliation with a homosexual activist organization may have adverse consequences to some individuals involved:

"We are not impressed by this purported reason. The very essence of the first amendment is that each individual makes his own decision as to whether joining an organization would be harmful to him, and whether any countervailing benefits outweigh the potential harm. We are aware that in recent years colleges and universities increasingly are voluntarily surrendering the role of parens patriae of their students which they formally occupied. But even if not surrendered voluntarily, the state and its agents are forbidden from usurping the students' right to choose. In this respect, the governing bodies of schools have no greater authority than do state officials. [Citations omitted.] As the Supreme Court noted in [Healy v. James, 408 U.S. 169, [92 S.Ct. 2338, 33 L.Ed.2d 266] (1972)], a state college or university 'may not restrict speech or association simply because it finds the views expressed by any group to be abhorrent.' [408 U.S. at 187–88, 92 S.Ct. at 2349] Similarly, VCU [Virginia Commonwealth University] may not hinder the exercise of first amendment rights simply because it feels that exposure to a given group's ideas may be somehow harmful to certain students." Gay Alliance of Students v. Matthews, 544 F.2d 162, 165–66 (4th Cir. 1976).

Accordingly, the Court declines to consider the expert testimony proffered on this point.[55]

53. The experts were in agreement that homosexuality is not a mental disorder and is no longer defined as such by the American Psychiatric Association's Statistical Manual on Mental Disorders. (Tr. at 543–44, 771, 791–93) Further, they agreed that at least at the University level, it would not be harmful to students, either homosexual or heterosexual, to be exposed to a homosexual professor who competently performs his duties. (Tr. at 555–56, 562, 776) Indeed, the defendants' expert, Dr. Mechanick saw this exposure as beneficial as long as the professor did not try to persuade students to become homosexuals:

"I think there is a great deal of value both, for example, in having individuals of homosexual orientation as part of a faculty and having [an] organized homosexual group who can work together and socialize publicly without discrimination or impairment of their freedom. I think that is part of the openness

that contributes in a constructive way towards the resolution of a number of these conflicts." (Tr. at 562)

54. These reservations were directed primarily to defendants since the plaintiff's expert witness testified solely in rebuttal.

55. Even if the Court were to consider the expert testimony, the result reached would be the same. Dr. Mechanick foresaw no harm to students from either the Bulletin or Review articles. He expressed as his only concern that the News Journal article appeared "over-zealous" in presenting one side of an issue where two sides existed. This was accompanied by recognition that the tone of the article might be due to the reporter, and did not necessarily reflect on Aumiller or the Gay Community. (Tr. at 573–74) Mr. Annecillo, the plaintiff's expert, testified that he strongly doubted whether the articles could have an adverse affect on college

## III. AUMILLER'S RIGHT TO FREEDOM OF EXPRESSION

### A. *The Applicable Standard*

There can be little dispute that the decision not to renew Aumiller's contract was precipitated primarily by the three newspaper articles and the circumstances surrounding their publication. Accordingly, the proper framework for evaluating whether defendants' actions violated Aumiller's constitutional rights is to examine what limitation, if any, the University of Delaware may impose on the exercise of its employees' First Amendment rights.[56]

The principal Supreme Court decision on the issue of a teacher's right to freedom of expression is *Pickering v. Board of Educ., supra.* In *Pickering*, a public high school teacher was dismissed because he wrote a letter to the local newspaper critical of the local school board, which school authorities claimed contained a number of false statements. The Court held that the dismissal was improper and violated the plaintiff's First Amendment right to freedom of expression. While recognizing that teachers do not, by virtue of their employment, surrender their rights as citizens to comment on matters of public concern, the Court did note that:

"At the same time it cannot be gainsaid that the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. The problem in any case is to arrive at a balance between the interests of the teacher, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." (391 U.S. at 568, 88 S.Ct. at 1734–1735)

Although denominated as a balancing process, a close reading of *Pickering* reveals that the Supreme Court imposed rather specific limitations on the manner in which the so-called balancing was to occur. Where the statements can be shown or presumed to impede the teacher's proper performance of his daily duties in the classroom; to have substantially disrupted the regular operation of the school generally; to have violated an express need for confidentiality, or where "the relationship between superior and subordinate is of such a personal and intimate nature that certain forms of public criticism of the superior by the subordinate would seriously undermine the effectiveness of the working relationship . . .", 391 U.S. at 570 n. 3, 88 S.Ct. at 1735, the interest of the school administration in limiting the teachers' contribution to public debate generally will outweigh the individual teacher's interest in commenting upon matters of public concern. However, where none of these enumerated factors is present, the Court indicated that the inter-

---

students or generate confusion regarding either their actual or perceived sexual orientation. (Tr. at 773, 782–83)

**56.** The question of whether a homosexual professor employed at a university constitutionally can be dismissed or his contract non-renewed solely because he is a homosexual has not been addressed specifically. It has been held by a number of courts that homosexuality cannot be a *per se* disqualifying factor for Federal Civil Service positions. *See, e. g. Society for Individual Rights, Inc. v. Hampton*, 63 F.R.D. 399 (N.D.Cal.1973), *aff'd on other grounds*, 528 F.2d 905 (9th Cir. 1975); *Norton v. Macy*, 135 U.S.App.D.C. 214, 417 F.2d 1161 (1969); *Scott v. Macy*, 121 U.S.App.D.C. 205, 349 F.2d 182 (1965), *appeal after remand*, 131 U.S.App.D.C. 93, 402 F.2d 644 (1968). These decisions do recognize that based on a *particularized factual*

showing that an individual's homosexuality affected his job performance, separation from government employment might be justified. The District of Columbia Circuit has also limited the extent to which homosexuality may be used to deny or withdraw a security clearance relating to defense matters, *Gayer v. Schlesinger*, 160 U.S.App.D.C. 172, 490 F.2d 740 (1973), and one court has held that homosexuality does not by itself justify discharge from military service. *Saal v. Middendorf*, 427 F.Supp. 192 (N.D.Cal.1977); *but see Matlovich v. Secretary of the Air Force*, 45 U.S.L.W. 2074 (D.D.C. July 16, 1976). Since defendants have never contended that Aumiller's contract would not have been renewed based on the fact of his homosexuality alone, this Court has no occasion to pass on the issue. (*See* Docket No. 34, Pretrial Order; Stipulated Facts Nos. 23, 24)

est of the state is not significantly greater than its interest in limiting a similar contribution by any member of the general public, and absent proof of false statements knowingly or recklessly made by the teacher, *cf. New York Times Co. v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), a teacher's exercise of his right to speak out on issues of public importance may not furnish the basis for his dismissal from public employment.[57]

Defendants have called to the Court's attention two decisions which appear to bear specifically on the question of a public employer's right to freedom of discussion in the specific context of homosexuality and societal treatment of homosexuals. The first decision advanced by defendants is *McConnell v. Anderson,* 451 F.2d 193 (8th Cir. 1971), *cert. denied,* 405 U.S. 1046, 92 S.Ct. 1312, 31 L.Ed.2d 588 (1972). In *McConnell,* the Eighth Circuit upheld the refusal by a state university (the University of Minnesota) to hire an applicant [58] for the position of cataloguer at the University library. The Court emphasized that the University's refusal was not based merely on the homosexual propensities of the applicant or his desire clandestinely to pursue homosexual conduct. Rather, the refusal properly was based on the applicant's assertion of a right to pursue an activist role in implementing "unconventional ideas concerning the societal status to be accorded homosexuals . . ." as evidenced, *inter alia,* by his application to marry another male, and thereby to "foist tacit approval of this socially repugnant concept [homosexuality] upon his employer, who is, in this instance, an institution of higher learning." 451 F.2d at 196.

Defendants secondly cite *Singer v. United States Civil Service Comm'n,* 530 F.2d 247 (9th Cir. 1976), *vacated and remanded,*

429 U.S. 1034, 97 S.Ct. 725, 50 L.Ed.2d 744 (1977), in which the Ninth Circuit upheld the dismissal of a probationary employee (clerk-typist) of the Equal Employment Opportunity Commission on grounds of "immoral and notoriously disgraceful conduct," 530 F.2d at 250, in that he openly flaunted his homosexual way of life, had sought a marriage license with another man, and indicated further continuance of such activities while identifying himself as an employee of a federal agency. The Ninth Circuit held that the Civil Service Commission ("CSC") rationally could conclude that public knowledge that the government employed a homosexual employee " 'reflects discredit upon the Federal Government as his employer, impeding the efficiency of the service by lessening public confidence in the fitness of the Government to conduct the public business with which it was entrusted.' " 530 F.2d at 255.

The Court does not view either *McConnell* or *Singer* as limiting or otherwise affecting the applicability of the principles enunciated in *Pickering, supra,* to the case sub judice. First, the facts of the present case vary considerably from those present in *Singer* and *McConnell.* The plaintiffs in those cases both appeared to engage in certain activities for the express purpose of generating publicity or notoriety. Aumiller, by contrast, never engaged in comparable public conduct such as applying for a marriage license, kissing a man in public, or participating in homosexual demonstrations. Aumiller never set out to generate publicity, but was sought out by reporters desiring information about the Gay Community. Although he accommodated them by answering their questions and permitting his name to appear in the articles, this is a far cry from the type of activity engaged in by either McConnell or Singer.

---

**57.** The burden on the state in showing that the false statements were knowingly or recklessly made is a formidable one that is not satisfied where the statements are consistent with good faith error, and where there is no evidence in the record to show that anything other than carelessness or insufficient information was responsible for their being made. *Pickering, su-*

*pra,* 391 U.S. at 582, 88 S.Ct. 1731 (Appendix to Opinion of the Court).

**58.** McConnell initially was offered the position; however, the offer was nullified by subsequent action by the University Board of Regents. *McConnell v. Anderson,* 316 F.Supp. 809, 810–11 (D.Minn.1970), *rev'd* 451 F.2d 193 (8th Cir. 1971).

Second, both decisions are distinguishable. The holding of *McConnell* is inapposite because the lower court never reached plaintiff's First Amendment claim. 316 F.Supp. at 815. As a consequence, it was treated only cryptically in a footnote by the Eighth Circuit, 451 F.2d 196, n. 7. The continuing vitality of *Singer* is questionable because it was vacated and remanded by the Supreme Court, based on the Solicitor General's suggestion that the action of the CSC should be reconsidered in light of recently adopted changes in the Civil Service Personnel Manual which greatly restricted the ability of the CSC to base employment decisions on considerations of homosexuality.[59] Defendants contend that because the remand was essentially on a procedural ground, the basic reasoning of the Ninth Circuit's decision remains unaffected.[60] That position is untenable because the very fact of the change in CSC employment policy undermines the factual basis of the Ninth Circuit's decision: that public awareness of a government employee's homosexuality in and of itself adversely affects the ability of the government to perform its necessary functions.

### B. *The Present Case*

Defendants have made no attempt to show that Aumiller's performance of his daily duties was impeded[61] or that his statements breached an express need for confidentiality, and have made at best a half-hearted effort to show that there was a substantial disruption of the University as a result of Aumiller's statements. Defendants point primarily to the time Dr. Trabant reportedly devoted to the matter and the disruption of his normal schedule. To the extent some of his time was allotted to responding to phone calls and letters on the Aumiller matter, it is legally insufficient to constitute the type and magnitude of disruption envisioned by the Supreme Court in *Pickering, supra.* As far as the operation of the University as an institution is concerned, I find that no disruption arose from any of the articles.[62] In addition, a number of individual defendants, including Trabant, testified that they could work with the plaintiff if he were reinstated, which undercuts any argument that the efficient and harmonious work relations at the University were impaired by Aumiller's statements,[63] see *Pickering, supra; Sprague v. Fitzpatrick,* 546 F.2d 560 (3d Cir. 1977), *cert. denied,* —— U.S. ——, 97 S.Ct. 2649, 52 L.Ed.2d 255 (1977), and further minimizes the seriousness of any disruptive effect purportedly resulting from his statements.

Since the defendants have been unable to demonstrate that any of the previously discussed *Pickering* criteria apply, it is concluded that the interests of the University in regulating Aumiller's right of free speech are no greater than the interest of the State in regulating any citizen's free speech. Accordingly, only if the defendants can show that Aumiller willfully or recklessly made false statements can they pre-

---

**59.** The change in the Personnel Manual was set forth in a bulletin issued December 21, 1973, and provides in pertinent part:

"[Y]ou may not find a person unsuitable for Federal employment merely because that person is a homosexual or has engaged in homosexual acts, nor may such exclusion be based on a conclusion that a homosexual person might bring the public service into public contempt. You are, however, permitted to dismiss a person or find him or her unsuitable for Federal employment where the evidence establishes that such person's homosexual conduct affects job fitness—excluding from such consideration, however, unsubstantiated conclusions concerning possible embarrassment to the Federal service." (*Singer, supra,* 530 F.2d at 254)

**60.** Letter to the Court from Defense Counsel dated February 1, 1977.

**61.** The Court specifically finds that Aumiller's performance of his daily duties was not impeded. Furthermore, abundant testimony supports the finding that Aumiller's job performance over his two year employment was at a very satisfactory level. (Tr. at 177, 251)

**62.** *See, e. g.,* Tr. at 26 (Aumiller); 178 (Hansen); 244 (Gibson); 384–86 (deBlieu); 419 (O'Shea); 471–72 (Hitchens); 478–79 (Mulrooney); *cf.* Tr. at 713 (Campbell) (personally received no complaints relating to Aumiller's statements).

**63.** *See, e. g.,* Tr. at 211–14 (Hansen); 263 (Gibson); 627 (Trabant); 736 (Gouldner).

vail on the question of whether their actions violated Aumiller's right to freedom of expression.

In order to evaluate the facts under the *Pickering* standard, it is first necessary to ascertain when the actual decision not to renew Aumiller's contract was made. I conclude that for purposes of the sole cause of action in this litigation Trabant made a firm decision not to renew Aumiller's contract *no later than* the December 22, 1975 meeting attended by Trabant, Campbell, Gouldner and Hansen. This conclusion rejects the contention that a final decision was not reached until May, 1976, when the Board of Trustees ratified Trabant's rejection of Aumiller's three grievances.[64]

Defendants have gone to great lengths to attempt to convince the Court that the December 22 decision entailed nothing more than a determination by Trabant that he would not sign a contract for Aumiller *if one were presented to him*; but that this was not effectively a binding decision by the University not to renew Aumiller's contract. There can be little doubt, however, that in fact Trabant's decision did constitute a decision by the University not to rehire Aumiller for the 1976–77 academic term. Defendants were unable to point to even a single instance in the past history of the University where a contract had been signed by the Board of Trustees which had not been signed by the President of the University.[65]

As noted earlier, during the course of events that led up to this litigation, the defendants seem to have changed the reasons or at least the priority of reasons on which they relied to refuse to renew Aumiller's contract. Therefore, instead of examining the specific, articulated reasons, attention first will be turned to the factual information available to the defendants on December 22, 1975.[66] That is, the Court has scrutinized the record as of December 22 to determine the facts on which the defendants could have based their decision. The conclusion is that four factors arguably provided a basis for the decision not to renew the contract: (1) Aumiller's identification in the newspaper articles; (2) Aumiller's alleged false statements in the articles; (3) Aumiller's use of University facilities; and (4) a sign in Aumiller's office and the criticism of two University plays.

### 1. *Aumiller's Identification in the Newspaper Articles*

The first factor was the manner in which Aumiller was identified in the three articles: either as director of the University Theatre and/or faculty advisor to the Gay Community.[67] Defendants have contended that these institutional associations, coupled with the absence of a "disclaimer" that the views Aumiller was expressing were his own and not those of the University of Delaware, indicate that Aumiller intentionally or recklessly attempted to create the false impression that he was acting as a University spokesman.[68]

No significance is attached to the mere fact that Aumiller was identified by one of

---

**64.** As the discussion *infra* will show, although the Court has selected December 22 as the date when a firm decision was reached, whether a final decision was in fact reached in December, 1975, or in May, 1976, does not affect the Court's finding of a constitutional violation.

**65.** Tr. at 277–81 (Trabant); Gouldner Dep. at 20. Moreover, the written notice received by Aumiller stated very specifically that his contract would not be renewed for the 1976–77 academic year. (PX–16)

**66.** Although Aumiller did not receive written notice of Trabant's December decision until January 6, 1976, nothing of importance occurred during the interim.

**67.** Aumiller was identified in the Bulletin and Review articles as both the director of the University Theatre and the faculty advisor to the Gay Community. In the News Journal article he was identified only as the director of the University Theatre.

**68.** The University's concern in this regard is limited under *Pickering* to statements which intentionally or recklessly reflect University policies in a false manner. To the extent that Aumiller's statements directly or by implication relate correct or accurate University policies, unless confidential in nature, the University has no sustainable interest in limiting Aumiller's speech.

his official University titles and as advisor to the Gay Community. The University does not prohibit faculty members from using their official titles as a form of public identification.[69] Moreover, there is no support for defendants' insinuation that Aumiller authorized or desired identification in this manner. Aumiller never requested that he be identified in this capacity, although he was aware that Ms. deBlieu and Mr. O'Shea knew his official position. It was exclusively a matter of the reporters' choice.

Defendants' suggestion that Aumiller deliberately attempted to create the false impression that he was speaking on behalf of the University must be rejected based on the Court's previous express factual finding that Aumiller was not attempting to speak as a University spokesman. The testimony of both Ms. deBlieu and Mr. O'Shea (the two individuals whose testimony should be the most reliable in this regard) left no doubt as to the capacity in which Aumiller was speaking. If plaintiff were deliberately attempting to suggest that the University supported his position, he failed miserably with the two reporters.

Defendants further contend that Aumiller recklessly created the false impression of University authority by his failure to expressly disclaim such authority or to demand a clarification after the articles were published.[70] Whether this inaction by Aumiller meets the recklessness standard of *Pickering* is questionable. In any event, a fair reading of the three articles demonstrates the absence of any legitimate basis for interpreting the articles to imply that Aumiller was speaking on behalf of the University or that the University "endorsed" the views or positions he expressed. In the Bulletin and Review articles, his few statements simply are not susceptible to association in any way with University policy. In the case of the News Journal article, which more extensively focuses on Aumiller's views, his opinions generally are prefaced by the qualification "I think." The article as a whole presents factual information about the Gay Community and Aumiller's personal views on the manner in which homosexuals should be treated by society. It requires a substantial leap of imagination to infer from the article University endorsement of Aumiller's personal views.[71] Accepting as true President Trabant's testimony about the phone calls he received, the fact that a few members of the general public misperceived the capacity in which Aumiller was speaking in the News Journal

---

69. *See infra*, p. 1297, n.73.

70. If Aumiller's statements are otherwise protected by the First Amendment, based on the standards set forth in *Pickering, supra*, the Court is at a loss to understand how failure to seek a clarification of the remarks constitutionally can form a basis for nonrenewal.

Ironically, in the January 15, 1976 article in the Review, entitled "Trabant Fires Gay Professor" (PX–12), Trabant is reported as stating (although not in the form of a direct quote) that Aumiller's contract *would not be renewed*, and that this decision was "in response to a number of newspaper articles in which Aumiller gave his views on the need for public acceptance of homosexuality." (PX–12) Trabant at his deposition testified that his statement was inaccurately reported, because he only stated to the reporter that he would not sign a contract for Aumiller were one presented to him. (Trabant Dep. at 9–10) Trabant further categorically denies giving the reason attributed to him in the passage quoted above. (*Id.*) The Court notes there is no evidence in the record that Trabant sought to correct this mischaracterization of his remarks by contacting the reporter or the newspaper. Similarly, there is no indication in the record of an attempt to correct either headline in the Morning News (PX–11) or the Review (PX–12) which characterizes the defendants' actions, apparently inaccurately, as "firing" Aumiller.

In that same article Dean Gouldner is also quoted on certain benefits resulting from the President's action. At trial, Dean Gouldner specifically testified that she had been misquoted in the article and that she had made no attempt to contact the reporter in order to clarify or correct what she had said. (Tr. at 737–38)

71. One aspect of University policy may be discernable from the article: the University's policy of *neutrality* relating to the sexual preferences of its faculty and students. To the extent the existence of this policy was communicated, no false impressions were created. *See supra*, p. 1289.

article [72] is not sufficient to infer that Aumiller's statements generally were misconstrued by the public at large to the detriment of the University.

The Court concludes that Aumiller did not intentionally or recklessly attempt to create the false impression that he was acting as a University spokesman.[73]

### 2. Aumiller's Allegedly False Statements in the Article

Although defendants contend that Aumiller intentionally or recklessly made a number of false statements in the News Journal article, only two of the statements so identified by defendants warrant comment.[74] The first is the statement attributed to Aumiller that "University officials knew [he] was gay when they hired him last fall[,]" followed by the direct quote: " 'By

hiring me, they in effect told me that my sexual preference doesn't affect my ability to do my job. . . .' " (PX–8) It has been noted earlier that this statement is misleading to the extent that the term "University officials" includes Trabant, Campbell and others. For the testimony is unanimous that only Hansen and Gibson knew of his homosexuality in 1974. It also has been concluded that the statement does not imply University approval of homosexuality as a lifestyle. Further, even conceding the literal falseness of the phrase, the record in this case does not support a finding that Aumiller was deliberately or recklessly misleading.

The statement by Aumiller was given in response to a question by Ms. deBlieu concerning the reaction of the "administration" to his homosexuality.[75] (deBlieu Dep. at 20)

---

**72.** It was never established whether the phone calls all related to the misperception that the University endorsed Aumiller's views or whether some simply disagreed with Aumiller's views, irrespective of the capacity in which they were offered.

**73.** Defendants advanced the parallel argument that the method of identification of Aumiller in the three articles, coupled with the absence of a disclaimer, violated the University's regulation on academic freedom. This regulation provides in pertinent part:

> "It is recognized that if faculty members are to teach and carry on research effectively academic freedom is necessary. Academic freedom is the freedom of the faculty to teach and speak out as the fruits of their research and scholarship dictate, even though their conclusions may be unpopular or contrary to public opinion. Both within and outside the classroom the faculty should exhibit the accuracy, restraint, and respect for the opinions of others appropriate to educators and persons of learning. In relations with the public, they should make it clear at all times whether they speak as private citizens, as experts on the subject in question or as institutional spokesmen. In speaking as private citizens, faculty should make clear that they are doing so. In this connection, use of University titles should be permitted for identification purposes only and it should be made clear that institutional endorsement is not implied." (DX–5)

Assuming arguendo that this regulation is relevant to the matter at hand, defendants' characterization of Aumiller's actions as a violation of the regulation is wrong factually and legally. As noted above, the testimony of the

reporters and the articles themselves make it clear that Aumiller was not attempting to create nor did he create the impression of University endorsement. If the defendants are urging that the failure to disavow any University endorsement constitutes a violation of the regulation, then, as applied to the facts of this case, the regulation is unconstitutionally overbroad. See Shelton v. Tucker, 364 U.S. 479, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960); cf. Broadrick v. Oklahoma, 413 U.S. 601, 611–12, 615, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1974).

**74.** Three of the other examples cited by defendants either misconstrue what Aumiller was reported as saying or manufacture purported inconsistencies which in fact do not exist. (1) Aumiller never stated that people attending Gay Community meetings made public announcements at the meetings that they are gay. (2) The 600 figure regarding the number of homosexuals on campus was not presented as an actual count, but is clearly demarcated as an estimate. In this regard the alleged failure of Aumiller to reference the Kinsey study (A. Kinsey, et al., Sexual Behavior in the Human Male (1948)) as the basis for this estimate is of no significance. Even defendants' expert witness, when reviewing this estimate on the stand, did not find it to be so egregious as to warrant his disagreement with it. (Tr. at 566) (3) The fact that Aumiller cannot give an exact membership count for the Gay Community does not impair his ability to know that many members are involved in long term relationships.

**75.** It would also appear that the term "University officials" originated with Ms. deBlieu.

Aumiller's recollection is he specified that only Assistant Provost Gibson and Dr. Hansen knew he was gay when he was hired (Tr. at 109), but Ms. deBlieu does not remember Aumiller mentioning specific names. (Tr. at 395–96; *see* deBlieu Dep. at 20–21, 34–35) Even if Ms. deBlieu's recollection is more accurate, the Court finds that at most there was a legitimate misunderstanding between Aumiller and deBlieu, since the "administration" with whom Aumiller dealt during his hiring consisted of Hansen and Gibson, both of whom did know he was gay. It is concluded that Aumiller's response was reasonable and was ambiguous only insofar as the question itself was ambiguous. Accordingly, the Court concludes Aumiller did not deliberately or recklessly make the literally false statement.

The other statement is Aumiller's declaration that "we [the Gay Community] want to provide these gay people with a healthy, normal way of meeting other homosexuals. Who would find their sex in a bathroom if they could find it another way?" Defendants contend that Aumiller, by this statement, willfully or recklessly created the false impression that one of the purposes of the Gay Community is to help its members find sex partners. Aumiller concedes having made the statements, but claims that the two sentences represent an unfair amalgamation of two separate statements made by him, and at a minimum, should be separated by an ellipsis. Additionally, he contends that the "sex in the bathroom" statement was taken completely out of context, in that the statement was made to parody what he called popular stereotypes of homosexuals, and in no way was intended to suggest that one of the purposes of the Gay Community was to help members find sex partners. (Aumiller Dep. at 65–68) Indeed, Aumiller emphatically contends that

the purpose is just the opposite: to provide homosexuals with the opportunity to meet other homosexuals in a completely *non-sexual* environment. (*Id.*) Although Ms. deBlieu believed that the two statements had appeared correctly in the article, she also stated Aumiller never indicated to her that the purpose of the Gay Community was for homosexuals to find sex partners. (deBlieu Dep. at 33) In light of the entire thrust of the News Journal article (discussed *supra*) and Ms. deBlieu's own conclusion of the impression Aumiller gave her about the purpose of the Gay Community, it is concluded that Aumiller's statement in the article was taken out of context, and that he neither intentionally nor recklessly attempted to create the false impression that one of the purposes of the Gay Community was to provide sex partners for its members.

### 3. *Aumiller's Use of University Facilities*

The third factor is the manner in which the interviews were conducted; specifically that the interviews with Ms. deBlieu and Mr. O'Shea took place at least in part in Aumiller's University office, and the photograph of Aumiller accompanying the News Journal article was taken at the University Theatre. Initially, the Court notes that there is some doubt as to whether defendants on December 22, 1975, the operative date for assessing any First Amendment infringement by defendants, were aware that the interview with Ms. deBlieu took place in Aumiller's office.[76] This Court also believes that as of that date, the defendants did not know that the O'Shea interview had been given in Aumiller's office[77] or that the News Journal photograph had been taken in the University Theatre.[78] However, for

---

**76.** The overall tenor of President Trabant's testimony creates the apparent impression that he did know, although at one juncture Trabant implies he might not have known. (Tr. at 652)

**77.** Since the Review article was never specifically identified at the November 4 meeting and defendants never sought out Mr. O'Shea, much less prior to December 22, it is highly unlikely that the defendants at the December meeting

could have known that the Review interview took place in Aumiller's office.

**78.** President Trabant at trial testified that when the December 22 decision was reached, he was aware that the picture of Aumiller accompanying the News Journal article had been taken in the University Theatre, because one could tell where it had been taken by looking at the black background of the photograph. (Tr. at 654) It

purposes of demonstrating the legal insufficiency of any or all of these facts no matter when they were known, it can be assumed that Trabant and others were aware of all these facts when they met in December, 1975.

President Trabant testified at trial that he viewed it as improper for a University faculty member to use his office to advance his own "personal goals." (Tr. at 343–45) Although this may be an accurate statement of University policy, it is irrelevant to the facts of this case for two reasons. First and foremost, the newspaper articles cannot be characterized as advancing Aumiller's, "personal goal." Secondly, defendants conceded that it would be entirely appropriate for a faculty member to use his office in his capacity as a faculty advisor to a student organization. (Tr. at 346 (Trabant); 720 (Campbell)) Ms. deBlieu specifically testified that when she contacted Aumiller, she told him that she wanted to talk to him because she was working on an article *on the Gay Community.* (Tr. at 376) Mr. O'Shea only went to Aumiller's office to talk to Aumiller in his capacity as advisor to the Gay Community (Tr. at 412–14), after having approached him first at a Gay Community meeting. The office in both instances was selected primarily for reasons of convenience, given Aumiller's extensive work schedule and the fact that both reporters were also University of Delaware students.[79]

Similarly, the photograph that was taken of Aumiller for the News Journal article while he was at the University Theatre is integrally related to the interview with Ms. deBlieu about the Gay Community. Aumiller did not permit his picture to be taken at the University Theatre for the purpose of implicating the University or the Department of Theatre with Aumiller's views. Ironically, use of the theatre resulted from

Aumiller's devotion to his job and his unwillingness to take the time to go elsewhere to have the picture taken. Further, the caution exercised by Aumiller to insure that no students were included in any of the pictures seems remarkably inconsistent with the defendants' position that Aumiller was attempting to imply University endorsement of his personal lifestyle and philosophy.

Although Aumiller was speaking at certain points in the interview as a private individual, it was consistent with his role as the faculty advisor to the Gay Community (for which one of the *stated goals* is educating the public regarding gay concerns) to give information on that organization to reporters purportedly doing articles on the Gay Community. Thus Aumiller's use of his office as one of the places in which he talked to the reporters and permitting his photograph to be taken at the University Theatre does not deviate from the unwritten University policy on the use of faculty offices expressed by Trabant and Campbell. Aumiller did not select his office or the University Theatre as a special or symbolic forum for advancing his own "personal cause," as suggested by defendants.

### 4. *Aumiller's Office Sign and the Criticism of Two University Plays*

The fourth factor available to defendants consists of two items referenced in President Trabant's letter to Dr. Lenher on November 4. The first item is the reference to the offensive "signs" [sic] in Aumiller's office. In fact, a single 8½" x 11" sign appears in Aumiller's office, on which is printed " 'The most difficult step is often the most rewarding'—The Gay Community." The sign, as a form of written expression, falls within the scope of the protection afforded by the First Amendment.[80] Since

is concluded that President Trabant was less than forthright in this matter. It is patently impossible to determine anything from the background of the picture because the background is a completely black void.

79. Moreover, Ms. deBlieu testified that she had interviewed other faculty members who were

speaking as individuals and not official University spokesmen in their offices. (Tr. at 378)

80. This and other related signs are posted throughout the campus by the Gay Community, appear in advertisements in the Review, and in fact are paid for by the University. (Tr. at 18, 102)

**1300**

defendants have been unable to demonstrate any substantial interest in not having the sign appear in Aumiller's office,[81] the Court concludes that this consideration constitutionally could not serve as the basis for the decision not to renew Aumiller's contract.

The second item is the published criticism of two University plays on the grounds that they had unnecessarily "homosexual overtones." (See Tr. at 302, 346–48) The record developed at trial rather conclusively established that Aumiller's connection to these two plays was virtually nil. He directed neither play and was only tangentially involved in the selection of the two plays.[82] Indeed, in defendants post-trial brief, this reason is never mentioned as a justification for the decision not to renew Aumiller's contract. In light of this, the Court concludes that the defendants have withdrawn the criticism of the two plays as a reason to justify their decision not to renew Aumiller's contract.

Having reviewed the actual factors that could have been considered by defendants and having found them insufficient, attention is turned to the various inferences drawn from these factors as a basis for limiting Aumiller's First Amendment rights. The initial concern voiced by Trabant, aside from the personal insult felt by him, was Aumiller's "evangelistic endeavor to recruit more gays to his supposed cause" and his fear that Aumiller's remarks might embarrass the University. (PX–15) By the time of the December 22 decision, this general concern had been more narrowly focused into the then justification for the University's action: that Aumiller advocated homosexuality for the undergraduate. By the time of trial the emphasis had shifted away from the subject matter of Aumiller's "advocacy" to the manner in which that advocacy had been manifested. At trial President Trabant repeatedly intoned that the reason *ab initio* for the decision not to renew Aumiller's contract was that Aumiller was using his "faculty position or the facilities of the University to advance [his] own personal position." (Tr. at 298)

None of these various justifications for defendants' actions are supported by the facts. At different points in this Opinion, the Court has analyzed the inadequacies in the defendants' interpretation of the facts. It may be helpful, however, to review briefly those conclusions.

81. At trial Trabant indicated a number (approximately 30–40) "complaints" about the sign in Aumiller's office even prior to the November 4 meeting. Yet when pressed for specific names, Trabant could only name two: his executive assistant and Dr. Gibson, who he then qualified as saying that Dr. Gibson probably mentioned "seeing" the sign after the November 4 meeting. (Tr. at 326–29) Although Dr. Gibson may have mentioned seeing the sign, the Court has serious doubts, based on Dr. Gibson's overall trial testimony, whether his comment could be characterized as a complaint.

A different perspective concerning the sign was presented by Dr. Hansen, who testified he was aware of the sign, did not find it offensive, and characterized the philosophy it represents as "fairly sound." Dr. Hansen added that Aumiller's homosexuality was well known to everyone in the Department, which undercuts any suggestion by defendants that the presence of the sign in Aumiller's office was intended to be subtly coercive. (Tr. at 210–11)

*Connealy v. Walsh*, 412 F.Supp. 146 (W.D. Mo.1976), cited by defendants is inapposite. In that decision a specific effect on job performance was demonstrated based on the politically partisan bumper sticker on the car plaintiff, a social worker, drove when visiting clients. Moreover, before defendants in *Connealy* terminated plaintiff's employment, they engaged in numerous, unsuccessful efforts to have her remove the bumper sticker. Defendants in the case sub judice have engaged in no such efforts. Any potential offense caused by Aumiller's sign was never even called to his attention.

82. Both plays in question, *The Mousetrap* by Agatha Christie and *Twelfth Night* by William Shakespeare, were directed by Dr. Hansen. Dr. Hansen testified that the character in question in *The Mousetrap* was portrayed by the author as a flamboyant and extravagant homosexual; the scene criticized in *Twelfth Night* as being too explicit was in fact a heterosexual scene. (Tr. at 208–09) The Court agrees with Dr. Hansen's observation that "if Mr. Aumiller had had an influence in my direction of those two productions, it seems to me unlikely that he would have argued in favor of a strongly heterosexual scene in one case and argued in favor of a scene which would be, if anything, insulting to homosexuals in the other." (Tr. at 209–10)

To characterize Aumiller's remarks as representing an "evangelistic endeavor" or advocacy of homosexuality for undergraduates is nothing more than a gross distortion of his remarks in the three articles. A fair reading of Aumiller's remarks may lead to the conclusion that he does not think people who engage in homosexual acts are abnormal or immoral, but that is substantially different from advocating that heterosexuals should experiment with homosexuality. Nowhere does Aumiller advocate that anyone—whether homosexual or heterosexual—should engage in any type of sexual acts. There is no insinuation that homosexuality is preferable to heterosexuality. Most definitely there is no basis for reading Aumiller's remarks as proselytizing heterosexuals to experiment with homosexuality. The clear emphasis of Aumiller's remarks is addressed to expanding societal understanding of individuals who engage in homosexual acts. Aumiller's remarks were not intended to seek converts; rather he was seeking a change in how society treats individuals who are homosexuals.

Defendants' more recent justification that Aumiller used the University facilities and his University position to advance improperly his own cause is also groundless. Defendants have attempted to cast Aumiller as a misguided and manipulative individual, who intentionally or recklessly sought to intertwine the University in his own personal beliefs and views in a number of ways for the expressed purpose of conferring on them added credence. The record in this case is completely contrary to the Aumiller portrait painted by defendants. Aumiller neither sought out publicity on his own nor engaged in public acts. Aumiller did not surreptitiously manage to slip into his conversation with the two reporters the nature of his affiliation with the University or that he was the faculty advisor to the Gay Community; such information was reasonably related to the overall scope of the interviews. Aumiller never specifically requested to be identified by his University title; such identification was the choice of the reporters who spoke to him. Aumiller had no master plan to create the appearance of University sanction by conducting the interviews in his office and permitting his picture to be taken at the University Theatre. Aumiller acted in a manner reasonably related to his role as faculty advisor to the Gay Community, and acted in a manner that advisors to any other student organization apparently can act without fear of reprisal. The selection of these locations was not premeditated as suggested by defendants, but was fortuitous, dictated by concerns of time and convenience. In the one instance where confusion might have arisen—the possibility of students in the play being photographed with Aumiller— Aumiller took the necessary measures to ensure that the confusion did not arise.

Unquestionably there are certain circumstances in which a faculty member can take unfair advantage of his University affiliation or of the University's facilities. This, however, is not such a case. Aumiller neither sought to create the false impression that he was speaking on behalf of the University or that the University endorsed his views nor did he set out to exploit the facilities of the University to add credence to his personal views.

■ The Court fully recognizes that homosexuality is an extremely emotional and controversial topic and that Aumiller's opinions on the subject quite likely represent a minority view. But this unpopularity can not justify the limitation of Aumiller's First Amendment rights by the University of Delaware. Indeed, the fundamental purpose of the First Amendment is to protect from State abridgement the free expression of controversial and unpopular ideas. *See Terminiello v. Chicago*, 337 U.S. 1, 4, 69 S.Ct. 894, 93 L.Ed. 1131 (1949). The premise of the free speech clause is "that the best test of truth is the power of the thought to get itself accepted in the competition of the market [of ideas]." *Abrams v. United States*, 250 U.S. 616, 630, 40 S.Ct. 17, 22, 63 L.Ed. 1173 (1919) (Holmes, J., dissenting). The decision not to renew Aumiller's contract because of his public statements contravenes these most basic teachings of the First Amendment and cannot be tolerated.

■ The Court concludes that the defendants' decision not to renew the contract was based solely on Aumiller's protected public statements about homosexuality. Accordingly, defendants impermissibly have infringed Aumiller's right of freedom of expression.

## IV. AUMILLER'S DELIBERATE MISLEADING OF DEFENDANTS

■ Defendants contend that irrespective of whether the University's action infringed Aumiller's First Amendment rights, Aumiller has no "standing" to assert that defendants violated his rights. *See Acanfora v. Board of Educ.*, 491 F.2d 498 (4th Cir.), *cert. denied* 419 U.S. 836, 95 S.Ct. 64, 42 L.Ed.2d 63 (1974).

Defendants first argue that Aumiller lied to Trabant at the November 4 meeting and later made intentional misstatements during his deposition and at trial, as a result of which he has forfeited his right to relief.[83] This argument lacks a factual basis.

Defendants' claim that Aumiller purposely deceived President Trabant is simply a rehash of the factual discrepancies between the recollection of Aumiller and Ms. deBlieu. Defendants have been unable to show any evidence of intention on the part of Aumiller to deceive Trabant, but only infer from the discrepancies that Aumiller must have intentionally lied. Throughout this Opinion the Court has found it unnecessary to resolve certain discrepancies between Aumiller's and Ms. deBlieu's testimony, because regardless of whose recollection was more accurate on a certain point, the legal outcome would not be affected. The Court's evaluation of Aumiller's demeanor on the stand is that he was a thoroughly credible and truthful witness. Even if the Court were not convinced that in every instance Aumiller's recollection is more accurate than that of Ms. deBlieu, the Court nonetheless is convinced that Aumiller's testimony is truthful and accurate to the best of his recollection. Given these circumstances, the Court must dismiss defendants' argument on this point as totally without merit.

Defendants make much of the possible errors in the Aumiller deposition regarding the location of the interviews with the News Journal and Review reporters. If there were errors, they at most were a failure in memory, not an intent to deceive. (*See* Tr. at 90)

Finally, defendants contend that Aumiller purposely lied at trial when he testified that the University of Delaware Center for Counselling contacted the Gay Community for the purpose of offering lay counselling training to members of the Gay Community so that they could deal with students experiencing sexual identity crises. Aumiller's testimony on the point of whether the Center for Counselling contacted the Gay Community or members of the Gay Community contacted the Center for Counselling for the purpose of counselling training arose in rebuttal and is completely unrelated to the merits of the case. Any misunderstanding in the matter has been rectified by Dr. Bishop's affidavit. (Docket No. 40) Defendants' assertion that "[p]resumably, Aumiller knew that the defendants then in the courtroom had no knowledge to the contrary and that it was safe to make such [false] statements . . ." (Defs.' Post-Trial Brief at 28) is completely speculative and unsupported by any evidence on the record.

For the above reasons, the Court concludes that Aumiller has not forfeited his standing to bring this lawsuit.

## V. AUMILLER'S LIVING ARRANGEMENTS

■ Although not originally an issue in this case, based on information obtained during Aumiller's deposition, defendants now contend that Aumiller's living arrangements further support Trabant's decision not to renew Aumiller's contract. Aumil-

---

**83.** Defendants have not contended under *Acanfora* that Aumiller intentionally omitted from his University of Delaware Faculty Personnel Information Form (DX–8) his affiliation with the Gay Community.

ler, in turn, contends that to base his non-renewal on his living arrangements violates his right of privacy guaranteed by the First, Fourth, Ninth and Fourteenth Amendments.

Unquestionably Trabant's December 22 decision not to renew Aumiller's contract was directly prompted by publication of the three newspaper articles. It has been held above that Trabant's decision predicated on that reason violated Aumiller's right to freedom of expression guaranteed by the First Amendment. The possible existence of a secondary or peripheral reason does not vitiate the fact of a constitutional violation. To the extent that defendants contend that they are entitled to judgment in their favor based on Aumiller's living arrangements, notwithstanding their violation of his First Amendment rights, their contention is erroneous.

The existence of a collateral justification for defendants' actions possibly may be relevant to the *scope of relief* afforded to Aumiller, particularly regarding the appropriateness of reinstatement as a remedy. In *Mt. Healthy City School District v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), the Supreme Court recently indicated that once a plaintiff has shown that his conduct was constitutionally protected and was a motivating factor in the defendants' decision not to rehire him, then defendants can limit plaintiff's remedy by demonstrating by a preponderance of the evidence that they would have reached the same decision even in the absence of the violation of the protected right. If this burden is satisfied, the Supreme Court indi-

cated that the plaintiff would not be entitled to reinstatement as a remedy. The purpose of the remedy in such a context is to restore the plaintiff to the position he would have been in but for the constitutional violation, but not to place him in a better position than if no violation had occurred.

At oral argument the Court requested short letter memoranda from both parties discussing the applicability, if any, of *Mt. Healthy* to the present case. Significantly, defendants chose not to mention in their letter memorandum Aumiller's living arrangements as one of the reasons for not renewing his contract.[84] Notwithstanding this apparent concession, because the Court believes that the plaintiff's right to reinstatement in this case is unaffected whether one selects December 22, when Trabant did not know of the roommates, or May, 1976, when he did,[85] this issue will be treated in light of *Mt. Healthy*.

The information adduced at Aumiller's April 8, 1976, deposition on which Trabant purportedly relied in May, 1976, was that Aumiller shared a house with two undergraduate students, both of whom were majoring in the Department of Theatre, and one of whom was a homosexual. The homosexual undergraduate had been a member of the household for two years. The nonhomosexual undergraduate moved in sometime in June 1975. Aumiller did not have a sexual relationship with either student. (*See* Aumiller Dep. at 44–48; 74–75)[86]

Additional facts were adduced at the continuation of Aumiller's deposition and at

---

**84.** Had Aumiller not instituted this litigation to vindicate his constitutional rights, the University would have had no knowledge of Aumiller's living arrangements. Thus, the University assumes an unenviable position when it contends that Aumiller would not have been rehired because of his living arrangements.

**85.** *See supra*, p. 1288.

**86.** Following completion of Aumiller's deposition on April 8, 1976, counsel for Aumiller made application to the Court for a protective order restricting defendants' ability to inquire into Aumiller's living arrangements. (Docket No. 13) Although the Court declined to issue a

formal protective order, certain guidelines were laid down concerning the permissible scope of defendants' inquiry. (Docket No. 14) Aumiller's deposition was continued on June 4, 1976, and further information on his living arrangements was adduced. It should be noted that the continued deposition occurred after President Trabant's rejection of Aumiller's grievance on May 24, 1976. Accordingly, the information obtained at the continued deposition could not have been relied upon by President Trabant even when his May, 1976, decision was reached.

trial which also should be mentioned. The two roommates were ages 22 and 27 at the time of Aumiller's deposition, the older one being the homosexual student. (Tr. at 834) Parents of both students were aware of the living arrangements and of the sexual preferences of all individuals in the house. (Tr. at 834; Aumiller Continued Dep. at 114) In the house each person had a separate bedroom and the residents shared the rent and all expenses equally. (Aumiller Continued Dep. at 110–12) Although the students were in the Department of Theatre, Aumiller had never taught either in a classroom. (Tr. at 834) [87] The only "academic-type" contact at all between Aumiller and his roommates is that the older roommate appeared in one play which Aumiller directed. (Tr. at 125, 834) Finally, defendants' admission that faculty members are "free" to rent rooms to students is less than accurate, in that the University openly encourages faculty to do so because of a chronic housing shortage. For example, the following notice was circulated to all faculty during the summer of 1976:

"ASSISTANCE PLEASE—The University is experiencing a temporary room shortage for those students wishing to live on campus for the fall semester. As a result, approximately 250 students are looking for housing off campus until spring semester (February) when they can be accommodated in residence halls. If you or any of your friends and neighbors are interested in renting a spare room to a University student—typical rents are $15–$22 per week—please contact Mr. Charles R. Christian in the Office of Housing and Residence Life, 5 Courtney Street, 738-2471." (Tr. at 674) [88]

Defendants contend that although faculty members are "free" to rent rooms to students, they are expected to use judgment in their housing arrangements. Trabant at trial testified that it is inappropriate in his opinion for a faculty member to "set up residence" in the manner Aumiller did with undergraduate students in his department because students are not "free agents" and are dependent upon professors in a variety of ways. [89] Furthermore, Aumiller's deposition testimony, according to Trabant, cast doubt on Aumiller's assurance to Trabant at the November 4 meeting that he would not have any relationships with students which might reflect adversely upon the University.

Neither of the concerns expressed by President Trabant are factually supportable. As defendants concede, there is no

87. As previously noted, although Aumiller's official status was a "lecturer" in the Department of Theatre, his duties were primarily administrative and over the course of two years he taught only one course.

88. Moreover, although the record is not entirely clear on this point, it appears that the living arrangements with the homosexual student, which the Court assumes forms the basis for the defendants' objection, were established at a time when Aumiller was still a student and prior to when he became a lecturer. (*See* Aumiller Continued Dep. at 109, 111 (living arrangements established June, 1974); *compare* DX–2 (signed Aug. 28, 1974))

89. Defendants cite a number of state law cases from California and New York, which they characterize as suggesting that "actual or potential" faculty-student involvement of a sexual nature or certain sexual activities of teachers are legitimate bases for non-renewal of that faculty member's contract. However, the cases cited by defendants deal with *actual* as opposed to *potential* sexual relations between teacher and student, *see, e. g., Board of Trustees v. Stubblefield*, 16 Cal.App.3d 820, 94 Cal. Rptr. 318 (Ct.App.1971); *Jerry v. Board of Educ.*, 35 N.Y.2d 534, 364 N.Y.S.2d 440, 324 N.E.2d 106 (Ct.App.1974), or else address the situation in which the sexual activities engaged in by the teacher with non-students violated specific criminal statutes. *See, e. g., Pettit v. State Bd. of Educ.*, 10 Cal.3d 29, 109 Cal.Rptr. 665, 513 P.2d 889 (1973); *Moser v. State Board of Educ.*, 22 Cal.App.3d 988, 101 Cal.Rptr. 86 (Ct.App.1972); *Sarac v. State Board of Educ.*, 249 Cal.App. 58, 57 Cal.Rptr. 69 (Ct.App.1967). Neither situation is present herein. There is no contention of a sexual relationship between Aumiller and either of his roommates, and Aumiller has not engaged in sexual activity that is made criminal by Delaware state law. *See* 11 Del. C. §§ 762–66, 773 (1975 and Supp.1976) (consensual homosexual acts between individuals over the age of sixteen not subject to criminal sanction). Accordingly, the Court concludes that the cases referenced by defendants are of limited relevance to the case sub judice.

evidence at all of a sexual relationship between any of the residents of Aumiller's household. (*See* Tr. at 170–71; 834; Defendants' Post-Trial Brief at 35) Aside from the mere fact of the shared residence, defendants did not offer a single piece of independent evidence indicating that Aumiller had exploited or taken advantage of his roommates. Indeed, every piece of additional evidence cuts the other way: the fact that Aumiller was not having sexual relations with either roommate; the fact that the parents of both roommates were aware of the sexual preference of each resident in the house; the fact that Aumiller never taught either student in a class and thus never controlled a grade either roommate would receive; and the fact that both roommates were over the age of majority all undermine defendants' suggestion that Aumiller exploited his roommates in some way. In addition, it must be emphasized that the University had no policy proscribing faculty and students from sharing the same residence, and indeed *encouraged such living arrangements.* (Tr. at 674)

More importantly, Trabant has never stated that Aumiller would not have been rehired because of his living arrangements alone. At his deposition (taken on March 16, 1976, and thus prior to his knowledge of Aumiller's living arrangements), Trabant made clear that there was no basis for his decision other than that directly related to the three newspaper articles and that he would reject any alternative to the real reason for his decision not to renew:

"Well, I believe she [Dean Gouldner] said she would prefer that I wouldn't take that position; it would cause trouble, and that the campus in her opinion was in an excellent shape; that people had a sense of confidence, people were positive, things were coming along very well, and she said this decision of yours will upset things and it is regrettable.

"And I said, 'Well, if it upsets, it upsets, but that is the decision.' And she said she wishes, and I believe that Dr.

Campbell joined in on this—or it may have been he perhaps took the initiative, I am not sure of that: Couldn't we find an alternative way to accomplish the same goal. And I said, no, because we all would know what I had said. They would know my decision and we had to stick to what the facts were because we had to continue work together in an honest way.

"*And that was my decision and that was the basis for my decision and that was the way it would have to be.*" (Trabant Dep. at 55–56) (emphasis added)

After learning of Aumiller's living arrangements first adduced at Aumiller's deposition on April 8, 1976, Trabant never retreated from his original position as to the real basis for his decision. Thus, in his ruling on the grievance on May 27, 1976, he never mentioned the living arrangements as a basis for rejection of Aumiller's grievance. Similarly, at trial, he never stated or even intimated that Aumiller's contract was not renewed because of his living arrangements or any other reason other than that perceived by him as directly related to the three newspaper articles. (Tr. at 592–93; 670–75)

Therefore, it is concluded on the basis of what Trabant said or did not say at the December, 1975 meeting, at his March, 1976 deposition (both of which predated his knowledge of Aumiller's roommates), in his May, 1976 decision and at trial, that if the University had known of the living arrangements of Aumiller in December, 1975, absent the newspaper articles, his contract would have been renewed.[90]

## VI. REMEDY

Having found a constitutional violation, attention is now turned towards formulation of an appropriate remedy. The relief requested by Aumiller includes: (1) reinstatement with back wages for the 1976–77 academic term, and removal from his employment records of any reference to this incident; (2) compensatory damages for the

---

**90.** Given this conclusion, it is not necessary to address plaintiff's contention that to predicate the non-renewal on his living arrangements would have violated his right to privacy.

emotional distress, embarrassment and humiliation suffered by him as a result of defendants' actions; and (3) punitive damages from defendants Gouldner, Campbell, Lenher, and Trabant. Aumiller also seeks an award of costs and attorneys' fees.[91]

Before addressing these specific prayers for relief, two general issues raised by defendants first must be considered: (1) whether the University is a person under 42 U.S.C. § 1983,[92] and (2) whether those defendants sued in their individual capacities are entitled to the defense of official immunity.

■ Defendants have questioned whether the University of Delaware is a person under 42 U.S.C. § 1983. This objection does not warrant extended discussion, since the Court concurs with Judge Stapleton's very able analysis of this question in *Gordenstein v. University of Delaware*, 381 F.Supp. 718, 724–26 (D.Del.1974). After carefully examining the specific relationship between the University of Delaware and the State of Delaware, Judge Stapleton concluded that the University did not qualify as a state agency in the context of Section 1983, and consequently could be treated as a person for purposes of actions brought pursuant to that section. Defendants' invitation to revisit that holding is declined.

The four defendants sued both in their individual and official capacities, Dean Gouldner, Provost Campbell, Chairman of the Board of Trustees Lenher, and President Trabant contend they are entitled to the defense of official immunity regarding any possible award of damages in favor of Aumiller. In regard to defendants Gouldner, Campbell and Lenher, it is not necessary to reach the question of an official immunity defense, because as of December 22, 1975, none of these three defendants was sufficiently involved in the actions of the University (Trabant's decision not to renew Aumiller's contract) to warrant imposition of personal liability. The evidence of record discloses that neither Campbell nor Gouldner was directly implicated in the making of the original decision other than Campbell's urging alternative grounds[93] and Gouldner's examining possible campus ramifications of the decision. Although Dr. Lenher was advised by President Trabant both before and after the November 4 meeting that Trabant was concerned about Aumiller's statements (Tr. at 485–86), he had no further involvement in the matter until the meeting of the Board of Trustees the following May.[94] At that meeting, Lenher did not even vote on the resolution ratifying President Trabant's rejection of Aumiller's grievances. (Tr. at 492) Accordingly, the Court concludes that the actions of Gouldner, Campbell and Lenher did not directly infringe Aumiller's constitutional rights. If the May, 1976 rather than the December, 1975 date were the critical date for purposes of ascertaining when the decision was reached, the same result would obtain with respect to Gouldner and Lenher, but the issue as to Campbell's immunity would present a much closer question that need not be resolved herein.

■ The circumstances surrounding President Trabant's participation in the

---

**91.** Although initially based on defendants' bad faith, the request for attorneys' fees is now predicated on the Civil Rights Attorney's Fee Awards Act of 1976, Pub.L. No. 94–559, Oct. 19, 1976, 42 U.S.C. § 1988 (Supp.1977).

**92.** "State action" for purposes of 42 U.S.C. § 1983 was understandably not controverted by defendants presumably because of an array of admitted facts in the Pre-Trial Order. (Docket No. 34) *Cf. Braden v. University of Pittsburgh*, 552 F.2d 948 (3d Cir. 1977).

**93.** The Court is somewhat disturbed by Campbell's effort to get Trabant to base his decision on financial considerations rather than the true reason, although this alone is not sufficient to deprive Campbell of the protection of official immunity.

**94.** Dr. Lenher, as Chairman of the Board of Trustees, did respond to multiple letters directed to Board members. (*See* PX–19). Also, apparently after this litigation commenced, but prior to the Board's ratification of Trabant's May, 1976, action, the Executive Committee of the Board, on which Lenher sits, did meet on a couple of occasions concerning the Aumiller affair. (Tr. at 524) However, neither of these occurrences placed Lenher in a position of responsibility for the University's actions.

matter markedly differ from those of the other defendants sued in their individual capacities. As President of the University, it was Trabant who made the actual decision not to renew Aumiller's contract. Accordingly, Trabant's claim to an official immunity defense must be addressed. In order to qualify for this defense, President Trabant, as a non-judicial state official, must demonstrate by a preponderance of the evidence (1) that he acted without malicious intention to deprive the plaintiff of his constitutional rights or cause him to suffer other injury, *and* (2) that he did not know and reasonably need not have known that his conduct violated the constitutional rights of the party affected. *Skehan v. Board of Trustees*, 538 F.2d 53, 60–62 (3d Cir. 1976) (en banc); *see Wood v. Strickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975).

 Throughout the entire course of events, Trabant's decision was opposed in varying degrees by other administrators, as well as by the College Hearing and University Appeals Committees. More importantly, in the November 4 letter to Dr. Lenher, President Trabant openly acknowledged that he had been apprised of the fact that if he chose not to renew Aumiller's contract, "the chances of the courts upholding any action that I take are minimal." [95] (PX–15) The Court does not mean to suggest that a public official's hands are tied until the slightest doubt about the legality of a particular action is resolved, for fear of losing the cloak of official immunity. Where doubts are present, however, the course of conduct followed in resolving those doubts is of importance. In the case at bar, President Trabant took no measures to resolve the doubts. He never attempted to obtain the reporter's respective views of the capac-

ity in which Aumiller spoke to them nor did he seek out the advice of counsel prior to the December 22 decision as to the legality of the action he was contemplating. Nor is it even clear that at the time of his May, 1976 decision Trabant had sought legal advice on the constitutionality of his actions. (Tr. at 588) [96] He just acted. Where a public official who is aware of uncertainties surrounding the propriety of a particular course of conduct pursues that course of conduct without first attempting to resolve factual and legal doubts, this Court only can conclude that the public official has shed his cloak of official immunity and acts at his peril. *See Johnson v. Anderson*, 420 F.Supp. 845 (D.Del.1976). Succinctly stated, Trabant has failed to demonstrate by a preponderance of the evidence that he acted without a malicious intention to violate plaintiff's rights and that he did not know nor through reasonable efforts could have found out that his actions would have violated Aumiller's rights.[97]

## A. REINSTATEMENT AND BACK WAGES

 Numerous decisions have recognized that reinstatement is an integral part of the remedy where a teacher, or other public employee, has been terminated from employment for the exercise of rights protected by the First Amendment. *See, e. g., Sterzing v. Fort Bend Independent School District*, 496 F.2d 92, 93 (5th Cir. 1974); *Woodward v. Hereford Independent Sch. Dist.*, 421 F.Supp. 93 (N.D.Tex.1976); *Starsky v. Williams*, 353 F.Supp. 900, 928 (D.Ariz.1972), *aff'd in part and rev'd in part*, 512 F.2d 109 (9th Cir. 1975); *Hanover Federation of Teachers v. Hanover Community School Corp.*, 318 F.Supp. 757, 763 (N.D.Ind.1970), *aff'd* 457 F.2d 456 (7th Cir.

---

**95.** Trabant's attempted explanation of this comment (Tr. at 580–81) is unsatisfactory in that it focuses on public perception of his actions and not on their legality, which is the matter implicitly addressed by the statement in the letter to Dr. Lenher.

**96.** *See infra*, pp. 1311–1312.

**97.** Defendants suggest that the University of Delaware as a corporate entity might also be entitled to the defense of official immunity, however the Court finds that the policies governing availability of the official immunity defense to public officials sued in their individual capacities are not applicable to corporate entities. *See, e. g., Scheuer v. Rhodes*, 416 U.S. 232, 239–40, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974).

1972). The violation in this case appears to present the classic situation in which reinstatement accompanied by an award of back salary constitutes an appropriate method of vindicating Aumiller's rights.

Defendants' primary objection to reinstatement is predicated on *Mt. Healthy City School District v. Doyle, supra.* Defendants' unarticulated *Mt. Healthy* objection, relating to Aumiller's living arrangements, has already been addressed and warrants no further discussion. Defendants, however, offer two additional reasons in support of their argument that reinstatement would place Aumiller in a better position than if the non-renewal had not occurred.

Defendants first contend that if the University had not acted unconstitutionally in refusing to renew the contract, Aumiller's position would not have been funded for the 1976–77 academic term for budgetary reasons. The evidence supporting this assertion is speculative at best. The record indicates only that the University was having some financial problems, but there is no firm indication that Aumiller's position would have been cut from the budget. The Court also notes President Trabant's refusal to rely on this consideration when it was suggested on numerous occasions by Provost Campbell. It is concluded that defendants have failed to prove by a preponderance of the evidence that Aumiller's position would not have been funded.

Second, defendants contend that if Aumiller's position were funded, he would have been no more than a non-preferred applicant for 1976–77 academic term, because of the University's need to conduct an affirmative action search before filling the position. The evidence relating to the purported need to conduct an affirmative action search is equally weak. Although the

University appears to have a commitment to conduct affirmative action searches for faculty who are in the "tenure track," its commitment to conduct the searches to fill lecturer positions can only be characterized as haphazard. (*See* Tr. at 623–26) Moreover, defendants are not in complete agreement among themselves that an affirmative action search would have been required. (*Compare* Tr. at 747 (Gouldner) *with* Tr. at 703 (Campbell)) [98] Accordingly, defendants have failed to prove by a preponderance of the evidence that an affirmative action search would have had to be employed before Aumiller would have been rehired for the 1976–77 academic term.

The Court holds that Aumiller is entitled to reinstatement for the 1976–77 academic term. Since the term is at an end, the primary manifestation of this relief will be in the form of his salary for the year, which he would have earned but for the constitutional violation. *Cf. Jinks v. Mays,* 464 F.2d 1223, 1226 (5th Cir. 1972). This amount, as agreed by the parties, totals $12,454.[99]

In a letter dated January 25, 1977, plaintiff's counsel for the first time suggested reinstatement for the 1976–77 academic term would be inadequate to vindicate plaintiff's rights, in view of the fact that by the time the matter had been decided, Aumiller would be able to serve little if any of that term in his former position. Counsel then suggested that a more appropriate remedy would be reinstatement for the 1977–78 school year.[100] The Court is not convinced that the reinstatement for the 1976–77 term is inadequate, since relief of this nature is intended only to place the plaintiff in the same position he would have occupied if the incident had not occurred. *See Mt. Healthy City School District v. Doyle, supra.* Certainly if Aumiller chooses

---

**98.** It is noted that neither of these reasons was ever suggested throughout the entire grievance proceeding.

**99.** At oral argument following trial, the Court inquired of defendants what Aumiller's salary would have been for the 1976–77 year. Mr. Burnett, counsel for defendants, responded to this inquiry by a letter dated January 24, 1977, in which he quoted the figure cited in the text.

In a letter dated January 26, 1977 to the Court from counsel for plaintiff, Mr. Sandler, this figure was accepted by plaintiff as representing his base salary for the 1976–77 academic term.

**100.** It does not appear that plaintiff seeks both back wages for the 1976–77 academic term and reinstatement for the 1977–78 academic term.

to apply for a position at the University for the 1977–78 academic year, defendants cannot discriminate against him on the basis of this lawsuit or the exercise of his First Amendment rights. Concededly the experiential value of teaching during the 1976–77 term irretrievably has been lost; nonetheless the Court does not view the circumstances of this case as warranting what would be a novel and extraordinary remedy of reinstatement in a future year, for an individual who had no property interest in future employment. *Cf. Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Perry v. Sindermann*, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

 Aumiller also has asked that any reference in his employment records held by the University to this matter be stricken. Defendants voiced no objection to this in their brief, and the Court is of the opinion that relief of this nature is appropriate. Therefore, defendants will be ordered to expunge all references to this incident from any record kept by them and are further instructed to make no reference to such incident in connection with any employment inquiries received concerning Aumiller.

## B. COMPENSATORY DAMAGES

Plaintiff has requested compensatory damages for the emotional distress, embarrassment and humiliation suffered by him as a result of defendants' actions. Evidence at trial relating to plaintiff's emotional distress, embarrassment and humiliation came primarily from Dr. Mario Pazzaglini, a clinical psychologist who began treating Aumiller in February, 1976. (Tr. at 436) Dr. Pazzaglini testified that in his opinion, Aumiller was suffering from anxiety neurosis and noted the following symptoms: "extremely high anxiety [the basic

core symptom], insomnia, nightmares, fatigue, feelings of being overwhelmed, loss of appetite, pressured speech [could not stop talking]." (Tr. at 437) In Dr. Pazzaglini's expert opinion, Aumiller's anxiety neurosis arose because of defendants' actions in refusing to renew Aumiller's contract. (Tr. at 442–43)[101]

Aumiller testified that he was extremely distraught by the University's actions and provided a detailed first-hand account of the symptoms cited by Dr. Pazzaglini and of the embarrassment and humiliation he felt. (Tr. at 74–85)[102] The record was further supplemented by testimony of Assistant Provost Gibson and two students who worked with Aumiller at the University Theatre that there was a noticeable deterioration in his general mental attitude after the announcement of the University's decision. (Tr. at 263 (Gibson); 475 (Hitchens); 479–80 (Mulrooney))[103] The Court concludes that Aumiller did suffer significant emotional distress, embarrassment and humiliation.

Defendants offer three responses to Aumiller's prayer for compensatory damages. First, they challenge whether the emotional distress, embarrassment and humiliation allegedly suffered by Aumiller is properly attributable to defendants' actions and suggest that the distress instead arose from notoriety resulting from publication of the three newspaper articles. However, Aumiller's testimony clearly established that no notoriety arose following the three articles, but that the notoriety only commenced in January, 1976, after the University's decision became publicly known. (Tr. at 74, 84) Further corroboration of this point was provided by at least three other witnesses. (Tr. at 262–63 (Gibson); 472 (Hitchens); 479 (Mulrooney)). The Court concludes that Aumiller's emotional distress, embar-

---

**101.** At trial a bill in the amount of $440 (PX–31) was introduced for Dr. Pazzaglini's services to that date.

**102.** Aumiller expressed great concern about his economic and professional future. He also indicated that in January, 1976, he started receiving threatening telephone calls urging that he leave the State of Delaware. (Tr. at 73–74)

**103.** Trabant was aware that his decision would cause Aumiller emotional difficulties, although he felt the interests of the University outweighed these concerns. (Tr. at 205–06 (Hansen))

rassment and humiliation were generated by defendants' violations of his constitutional rights and not by his own actions.

Defendants secondly attempt to impugn the testimony of Dr. Pazzaglini. The Court finds these efforts to be without merit. In particular, defendants have suggested that Aumiller's emotional problems stem from the fact that he was suffering from mononucleosis during this period, which Dr. Pazzaglini failed to take into account in his diagnosis. Undoubtedly, mononucleosis may have compounded Aumiller's symptoms, but this does not affect the validity of Dr. Pazzaglini's basic diagnosis, which the Court accepts as accurate.[104]

Defendants' third and most vigorous argument is that Aumiller can only recover compensatory damages for mental distress, embarrassment, and humiliation by proving the elements of the tort of intentional infliction of mental distress, which include, *inter alia*, that defendants acted intentionally for the express purpose of inflicting emotional distress, and that defendants' actions were "extreme and outrageous." *Cf. Alsteen v. Gehl*, 21 Wis.2d 349, 124 N.W.2d 312, 318 (1963).

■■■■■ Defendants have seriously misconstrued the nature of the burden plaintiff must satisfy. A number of cases collectively representing a distinct body of federal common law on the question of recovery of compensatory damages in section 1983 actions for emotional distress, embarrassment and humiliation rather clearly indicate that proof of the elements of the tort of intentional infliction of emotional distress is not a prerequisite for recovery of compensatory damages. *See, e. g., Glasson v. City of Louisville*, 518 F.2d 899 (6th Cir.), *cert. de-*

*nied* 423 U.S. 930, 96 S.Ct. 280, 46 L.Ed.2d 258 (1975); *Seaton v. Sky Realty Co., Inc.*, 491 F.2d 634 (7th Cir. 1974); *Donovan v. Reinbold*, 433 F.2d 738, 743 (9th Cir. 1970); *Sterzing v. Fort Bend Ind. School District*, 376 F.Supp. 657 (S.D.Tex.1972), *judgment vacated*, 496 F.2d 92 (5th Cir. 1974); *Sexton v. Gibbs*, 327 F.Supp. 134 (N.D.Tex.1970), *aff'd per curiam* 446 F.2d 904 (5th Cir. 1971), *cert. denied* 404 U.S. 1062, 92 S.Ct. 733, 30 L.Ed.2d 751 (1971); *Antelope v. George*, 211 F.Supp. 657 (D.Idaho 1962); *Solomon v. Pennsylvania R. Co.*, 96 F.Supp. 709 (S.D.N.Y.1951); *cf. Paton v. LaPrade*, 524 F.2d 862 (3d Cir. 1975); *Basista v. Weir*, 340 F.2d 74, 87 (3d Cir. 1965). A careful reading of these decisions, reveals that once a constitutional violation has been made out,[105] in order to recover damages for emotional distress, embarrassment and humiliation, it is only necessary for plaintiff to show: (1) that plaintiff in fact suffered emotional distress, embarrassment and/or humiliation; and (2) that defendant's actions proximately caused plaintiff's injury.

■■■■■ The Court finds on the record before it that both requirements have been met.[106] In fact the Court feels constrained to observe that the proof of emotional distress in this case appears to be substantially greater than in any of the cases previously cited. Indeed, in *Seaton v. Sky Realty Co., Inc., supra*, the Seventh Circuit indicated that such injury could be *inferred* from the circumstances as well as established by testimony, so that concrete evidence of mental distress was not even essential. 491 F.2d at 636. In the instant matter, abundant, concrete evidence was supplied, including the testimony of a clinical psychologist who treated the plaintiff for his resulting emo-

---

**104.** Dr. Pazzaglini in fact was aware that Aumiller was suffering from mononucleosis. (Tr. at 451–52)

**105.** Implicit in finding a constitutional violation is a determination that defendants' actions were willful or intentional as opposed to accidental. *See Basista v. Weir, supra*, 340 F.2d at 81.

**106.** Given the Court's prior finding that defendants Gouldner, Campbell and Lenher were not

sufficiently involved in the decision not to renew Aumiller's contract as to warrant personal liability for damages, the defendants who are jointly and severally liable for the compensatory damages are Trabant and the University of Delaware on whose behalf Trabant was acting. For purposes of damages, the University of Delaware and the Board of Trustees are in effect the same entity. (*See* Docket No. 34, Pretrial Order; Stipulated Fact No. 7)

tional difficulties, and evidence documenting out-of-pocket expenses incurred as a result of the emotional injury. Further, as a direct consequence of defendants' infringing upon Aumiller's protected speech, Aumiller encountered severe financial difficulties and was forced to lower his standard of living, as manifested by such objective criteria as moving to smaller quarters and selling a new car he had previously purchased. (Tr. at 81–84) The Court concludes that Aumiller is entitled to recover $10,000 for the mental distress, humiliation and embarrassment caused by defendants' violation of his constitutional rights.[107]

### C. PUNITIVE DAMAGES

Aumiller has requested punitive damages from defendants Trabant, Lenher and Campbell. In order to recover punitive damages, Aumiller must demonstrate a "malicious and wanton disregard for [his] constitutional rights" by defendants. *Paton v. LaPrade, supra,* 524 F.2d at 872; *see Sexton v. Gibbs, supra; Seaton v. Sky Realty Co., Inc., supra.* Having held previously that Dr. Lenher and Provost Campbell[108] were not sufficiently involved to warrant liability for compensatory damages, it follows that neither acted with a malicious or wanton disregard for Aumiller's constitutional rights and should not be held liable to Aumiller for punitive damages.

■ The fact that President Trabant is not entitled to the defense of official immunity is not conclusive on the question of his liability for punitive damages. *Cf. Morris v. Board of Educ.,* 401 F.Supp. 188, 215 n. 39 (D.Del.1975). Aumiller has the burden of demonstrating by a preponderance of the evidence that President Trabant acted maliciously or wantonly disregarded his constitutional rights in making the decision on December 22, 1975, not to renew Aumiller's contract.

■ For several reasons, the Court is convinced that plaintiff has satisfied this burden. Moreover, as noted in other parts of this Opinion, even giving the defendant the benefit of the May, 1976 date does not change the result. First, based on President Trabant's November 4 letter to Dr. Lenher, there can be little question that Trabant knew that his actions were of questionable legality. Yet the record clearly reflects that he failed to obtain legal advice concerning the propriety of his intended actions prior to his December 22 decision. (Tr. at 326) Plaintiff has sought to embellish his argument by asserting that Trabant did not even obtain the advice of counsel before issuing his opinion in May, 1976. This assertion by the plaintiff, however, is not supported by a preponderance of the evidence. Although there is some evidence to support his position (Tr. at 588), other evidence in the record suggests at least by inference that Trabant received or was a beneficiary of legal advice on this point at some time in April or May of 1976 at meetings of the Executive Committee of the Board of Trustees. (Tr. at 612; *cf.* Tr. at 524–38) What is clear and supported by a preponderance of the evidence is that Trabant failed to seek legal counsel prior to his decision in December, the date this Court has identified as the operative date for assessing a constitutional violation.

Second, based on what President Trabant knew or reasonably should have known both at the time he announced his decision in December, 1975 and when he denied Aumiller's grievances in May, 1976, there was no basis in fact for concluding either that Aumiller had improperly used his University title or University facilities to advance his personal cause. Further, Trabant never made a legitimate effort to verify his personal interpretation of the incidents that had occurred in the fall of 1975.

Notwithstanding that in May, 1976 when Trabant may have been operating under the aegis of advice from counsel, as to the

---

**107.** The Court rejects as completely unsupported defendants' suggestion that compensatory damages are not recoverable where reinstatement has been ordered, particularly where the two forms of relief are intended to remedy two separate injuries.

**108.** *But see supra,* p. 1306.

legality of his decision, his overall conduct nonetheless continued to evidence an absence of good faith. In particular, the Court notes Trabant's insistence in his May 24 decision (PX–30) that Aumiller had not made it clear that he was speaking as a private citizen, in spite of the uncontroverted testimony of the two reporters during the grievance proceeding (and the testimony of Ms. deBlieu at her deposition) that it was very clear to them that Aumiller was speaking in an individual capacity.[109] A further indicium of Trabant's bad faith is his emphasis on Aumiller's purported failure to seek corrections for errors contained in the News Journal article, when at least one other defendant, Dean Gouldner, and very possibly himself had not adhered to this course of conduct in their own dealings with the press in this very matter.[110] Thus, both in his December, 1975 decision and his May, 1976 opinion and decision, President Trabant displayed a wanton disregard for Aumiller's constitutional rights.

In concluding that President Trabant is liable for punitive damages, the Court notes that punitive damages are imposed in section 1983 actions primarily for their effect on defendant, and to vindicate the public interest in deterring malicious or wanton conduct by public officials. *See Davidson v. Dixon*, 386 F.Supp. 482, 489–90 (D.Del.1974), *aff'd mem.*, 529 F.2d 511 (3d Cir. 1975). The Court is satisfied that the record in this case provides an adequate basis for concluding that the public interest would be served by an award of punitive damages, given the pernicious insensitivity demonstrated by President Trabant in regard to Aumiller's constitutional rights in making his December, 1975 decision. Moreover, in arriving at an appropriate amount to be awarded in punitive damages, the Court must take into consideration the severity of the constitutional violation and

what is necessary to reasonably deter such conduct in the future. *See Fisher v. Volz*, 496 F.2d 333, 347 (3d Cir. 1974). The Court finds President Trabant liable to Aumiller for punitive damages in the amount of $5,000.

## VII. CONCLUSION

Judgment in this case will be granted in favor of plaintiff Aumiller, the Court having found that defendants, by their action in not renewing Aumiller's contract for the 1976–77 academic term because of his statements on the subject of homosexuality which appeared in three newspaper articles and the circumstances surrounding their publication, violated his right of freedom of expression as guaranteed by the First Amendment. There was no evidence that Aumiller's statements impeded his performance of his daily duties, substantially disrupted the University, violated an express need for confidentiality, or disrupted his working relationship with his superiors. Nor were defendants able to demonstrate that Aumiller intentionally or recklessly made false statements which reflected adversely on the University. Accordingly, it was concluded that defendants' interest in promoting the efficiency of the public services it performs through its employees does not outweigh Aumiller's interest in commenting upon matters of public concern. *See Pickering v. Board of Educ., supra.*

In view of defendants' failure to demonstrate by a preponderance of the evidence that Aumiller would not have been rehired for the 1976–77 academic term had there been no violation of his First Amendment rights, *Mt. Healthy City School District v. Doyle, supra*, Aumiller is entitled to an order granting reinstatement for the 1976–77 academic term and to back pay for that term totalling $12,454. Defendants further will be ordered to remove any reference to

---

**109.** The Court notes in passing that Trabant quoted out of context and without qualification a statement by the University Appeals Committee concerning Aumiller's advocacy of a homosexual lifestyle. *Compare* PX–29 at 4–5 *and* PX–30 at 5. Indeed Trabant in his May opinion changed the last quoted word from "immoral"

to "abnormal." This seems a transparent attempt to convert the Report of the University Appeals Committee to support a proposition which the Report clearly does not support.

**110.** *See supra*, p. 1296 n.70.

this incident from Aumiller's employment records held by the University and to make no reference to such incident in connection with any employment inquiries received concerning Aumiller.

In addition, defendants, the University of Delaware and President Trabant are jointly and severally liable to Aumiller for his emotional distress, embarrassment and humiliation resulting from the violation of his constitutional rights and will be ordered to pay Aumiller $10,000 in compensatory damages. Finally, because President Trabant demonstrated a malicious or wanton disregard for Aumiller's constitutional rights by his actions, he will be ordered to pay to Aumiller punitive damages in the amount of $5,000.

Submit Order on notice.[111]

APPENDIX A

# The Sunday Bulletin

### June 1, 1975

# Gays Battle Prejudices, Keep Low Profiles

By ROBERT STEINBROOK

*Special to The Bulletin*

*"What does teen-age America want to know about homosexuals?" asks Dick Aumiller, manager of the University of Delaware theater, as he and 20 other Delaware gays drink coffee in the basement of one of the school's dormitories.*

*"They want to know if we are sick and if we can be cured," he adds, relishing every cynical word that rolls off his tongue.*

*In a living room filled with plants and feminist literature in west Wilmington, two lesbian lovers say they will leave for Philadelphia soon because there "is absolutely nothing to do there."*

*"People don't mind if you're a homosexual, but they mind very much if you talk about it and are open," said one of the two, Debbie Snow, 24. "The number of gays in Delaware who have come out of the closet completely can be counted on the fingers of both hands."*

Delaware's visible gay community is apprehensive and acid-tongued these days, finding security in small private gatherings against the hostility and mocking they fear from a skeptical, conservative public.

"I was walking down Main st. in Newark holding a guy's hand, just like the fraternity brothers use to do," said Tom Jewell, a junior music major at the University of Delaware.

"A cop stopped us and—slapping his nightstick in his hand—said 'Let go.' I asked why and he admitted he couldn't stop us unless he received a complaint.

"Then he said something about women and children."

Although some sex researchers estimate that up to 10 percent of a random population will be homosexual or gay, the visible gay community in Delaware likely numbers in the hundreds.

It is concentrated largely in Newark at the university and in Wilmington, where

---

111. Upon motion by plaintiff, a hearing will be scheduled for consideration of plaintiff's application for attorneys' fees and costs.

much social activity centers for young and gays around the Gas Lamp Club on Shipley Street and, for older men, around the Golden Greeks' Alpine Room on King Street in the wee hours of the morning when city streets are deserted.

Still by-and-large, the community is closeted. Simply because it is tiny—and the state itself small and socially conservative—only the young and politically motivated are willing to openly profess their homosexuality.

In the southern part of the state, there are virtually no organized gay activities at all, outside of the Rehoboth Beach area.

Recent revision in the Delaware criminal code eliminated sanctions against any private sexual acts between consenting adults.

But bills to bar discrimination against gays in hiring and housing—the technical term is on the basis of "sexual preference" —floundered in the state senate last year. Only Sen. Herman M. Holloway (D–Wilmington) and Sen. Margaret R. Manning (R–Marshallton) supported them.

Gays face a tough choice: Being open about their sexual preferences or hide them from parents, employers and friends. For those that go public, the day they "came out of the closet" is like a college graduation or wedding day. Others never have that day, not wanting to jeopardize careers or families.

Homosexuals also must choose between being political—for example, lobbying to propel anti-discrimination measures for hiring and housing through the Legislature— or simply being social and enjoying life. The majority of Delaware's gays choose the latter course.

*"The prejudice we feel is not so much the overt losing your job type as the subtle everyday experiences," said one government employe. "It is going to a party and hearing people telling a faggot joke and not being able to say anything. Or people asking when you are going to get married and have children."*

The speaker here, like many other homosexuals, clearly fears for his job if his sexual preferences become well known among his fellow workers. "I work with children and homosexuality and child molestation go together in the minds of many people," he says. "And children are supposed to be impressionable."

It's a problem that also plagued Barbara, 28, who taught junior high school in suburban New Castle for five years before quitting last fall because she couldn't take "not being open" any longer. On her last day, she told her students she was a lesbian.

"If I had been emotionally stronger at the time perhaps I would have tried to both be open and keep my job," Barbara said. "Maybe I could have brought a test case in court."

Instead, Barbara and her housemate, Debbie Snow, organized a radical feminist group a year ago. The group, the Wilmington-based Delaware Separatist Dyke Group, incorporates the somewhat derogatory reference to lesbians as "dykes" in its name to change the negative term into a positive one. But the name itself scared many women away. The 10 women members do more "social rapping" than consciousness raising during weekly meetings in Debbie and Barbara's living room.

Last month, the United Campus Ministry denied gays at the University of Delaware a meeting place at the school.

### Confused and Troubled

The board, composed of students and Newark area religious leaders, said it was "confused and troubled by homosexuals" and confessed "an inability to clearly support the Gay Community as a community."

Dick Aumiller, faculty adviser to the gay community, termed it "a responsible and non-violent group of young men and women whose chief concern is that of human rights." He said "political or theological issues" should not prevent them from having a meeting place.

"People deal with us as sex objects not as human beings," said Debbie Snow, an Ohio State University graduate who described herself as an artist and a photographer. "We don't spend that much time in bed making love. We spend much more time sleeping and eating and working—just like everybody else."

*A gay University of Delaware student who's visiting the gay gathering place The Gas Lamp with a "straight" friend, gets up from the cocktail table to dance with another gay bar patron.*

*"Don't worry," the student counsels his straight friend who is left alone. "Nothing is going to happen to you if I leave you alone for a moment. It's not that kind of place."*

The Gas Lamp is the most popular gay gathering place in the state. It is upstairs behind a locked red door with a small buzzer at 915 Shipley st. in the heart of Wilmington.

On a Friday evening, the bar is vibrant and pleasant, with people dancing, drinking at the long rectangular bar and chatting frenetically. At 10:30 P.M. it is still virtually deserted but by 12:30 A.M. it is standing room only, with more than a 100 people crammed in.

In previous years, the club's clientele was largely swinging singles. The News-Journal newspapers held staff seminars beneath the red lamps and plush patterned red walls. The Democratic Forum also met at the Gas Lamp.

Now there are only a few "straights." Most of the gays are male but there are a few lesbian couples. There are also some blacks, but the majority of the clientele is white.

Politics seem frowned upon. One man who put up a notice on the bar bulletin board asking gays to write their legislators about anti-discrimination legislation said he was physically abused by a club employe and told pointedly "not to rock the boat."

## Male Go-Go Dancer

Several blocks away, on King St., is a more seedy gay gathering place. On its outdoor sign, the Golden Greek's Alpine Room portrays two pugilists doing battle; inside a young male go-go dancer clad only in a jock strap, pulsates to blaring juke box music beneath bright strobe lamps.

Nearly all the 35 bargoers on a recent Friday evening here are male, by and large older than those who frequent the Gas Lamp.

There are no well-known social hang-outs for gay women.

Asked the chances for a lesbian coffee house to open in Wilmington soon, a feminist responds, "minus 10." She explained that gay women are likely even more insecure than gay men, less inclined to frequent bars, particularly male-dominated bars, and more likely to spend time alone with their mates or in small social groups.

*"We've only had two complaints in two years," says Karen Peterson of the anti-discrimination section of the Delaware department of labor. "People just don't walk in and say, I'm a homosexual, I want to file charges."*

Legally, homosexuals have been aided by the revisions in the state criminal code, which eliminate sanctions against private sexual acts between consenting adults.

However, the Delaware Fair Employment Practices Act and the fair housing law have been interpreted by the state Human Relations Commission as not applying to discrimination on the basis of sexual preference.

## '. . . and I Don't Care'

"I don't know what the gay community in Delaware is, I don't know where they hang out and I don't care," said state prosecutor George Seitz. "The law says as long as they handle themselves in private—no pun intended—and they consent its no problem."

"But if they do it in public or if they force it on someone else, we do care," Seitz

 added. He said the law prohibits homosexual rape—forced sodomy—and statutes also govern public lewdness, indecent exposure, child molestation, disorderly conduct and assault.

For example, state officials recently charged Meridith Tarbutton of Wilmington with some 40 counts of sodomy against juveniles. Seitz said crimes involving homosexuality are not a law enforcement priority—arrests and prosecutions have been few—but he pointed to the Tarbutton case when asked if it could be a problem.

"Straight people really don't spend much time wondering whether their friends are gay," said Jewell. "But once I didn't think there were any other gay people in Delaware too."

"Well what if we could all be pupils for a day?" Aumiller mused, "Maybe we are all in positions of power already. Pass legislation making it legal and we will see if its really true."

APPENDIX B

# WILMINGTON SUNDAY NEWS – JOURNAL

**Sunday, November 2, 1975**

# GAYS: 'There's no need to deny fact,' says a homosexual activist at U.D.

By Jan de Blieu
Newark Bureau

Few coeds linger long enough to read past the first two lines of a sign that's prominently displayed on many University of Delaware bulletin boards.

"The hardest step is often the most rewarding," it says. "The Gay Community."

Despite stigmas and stereotypes commonly applied to homosexuals by university students, the Gay Community actively campaigns to recruit new members. Its ranks include about 80 students and community members who meet together Sunday evenings in a dormitory basement for confidence-building sessions, seminars and conversation on homosexuality.

Many members publicly admit that they're gay. Just as many hide their homosexuality from families and friends. But all have taken the step alluded to in the sign—all have admitted their homosexual tendencies to themselves.

The Gay Community at the university was formed by students four years ago, shortly after the beginning of a national homosexual rights movement. This year, the group is better organized and larger than ever, according to Richard Aumiller, director of University Theater and an active Gay Community member. Every week more people attend the Sunday night meetings, Aumiller says, and slowly more members are publicly admitting their homosexuality.

Aumiller began openly acknowledging his homosexuality during the national movement. "When I think of all the stuff I went through because I was unwilling to admit I'm gay, it all seems really stupid," he says.

"There's no need to go around denying the fact that you're homosexual for your

entire life. It's just a fact. There are millions of homosexuals."

"Conservative estimates say there are at least 600 gay people on this campus alone," he adds. "We want to provide these gay people with a healthy, normal way of meeting other homosexuals. Who would find their sex in a bathroom if they could do it another way? And we're trying to get people to realize that homosexuals aren't harmful."

Most Gay Community members are men. Only a handful of women attend meetings, although the group schedules speakers and seminars which may appeal to lesbians, Aumiller says.

"I think women don't have the need to come to meetings," he says. "Two women living together don't raise as many eyebrows as two men living together. There's more repression, more hostility directed towards male homosexuality. I think heterosexual males are more threatened by homosexuals than heterosexual women are."

Students tend to act more negatively towards gay people than faculty or administrators, Aumiller says. University officials knew Aumiller was gay when they hired him last fall.

"By hiring me they in effect told me that my sexual preference doesn't affect my ability to do my job," he says. "I haven't had any trouble at all with faculty members or administrators. They've treated me as an equal, which I am. If we can get everyone to treat gay people like that, then we'll have accomplished our goal.

Community Members strive to disprove common misconceptions about homosexuals. For example, many students and community members assume that homosexuals will proposition them if given the chance.

"What incredible conceit," Aumiller said. "Homosexual males aren't attracted to all men. Only a small number attract them. It's similar to the way that a heterosexual man will find only a small number of women attractive enough to have sex with."

Many people also assume that homosexuals are more promiscuous than heterosexuals. But many gays would settle down with one lover of societal judgements passed on homosexuals were less severe, Aumiller says. He adds that more heterosexuals would probably engage in promiscuous behavior if extramarital sex were socially acceptable.

"Some gay people do maintain long-term relationships," he says. "There are two men living in Brookside who own a house together and who have taken out a Blue Shield insurance policy together. Many of our members are involved in long-term relationships. Most gay people would stay with one person, I think, if they were given the chance to meet lots of homosexuals and find a compatible partner. There are certainly enough homosexuals to choose from.

"If all homosexuals would turn purple tomorrow, my how surprised people would be to find out how many of us there are," he says. "Gay people come in all types. The most masculine man may be gay. Your best friend might be gay and you wouldn't know it. It's stupid to stereotype a person you know to be gay as bad simply because he has different sexual preferences.

"It all boils down to the same question—what business is it of mine what you do in your bedroom? And why should you care what I do in mine?"

1318

# THE REVIEW

Vol. 99, No. 17 University of Delaware, Newark, Delaware Tuesday, November 4, 1975

# Gays Seeking Campus Acceptance

By Timothy O'Shea & Gwen Florio

*Editor's Note: This is part one of a two-part analysis of the campus Gay Community. The reporters attended the group's meetings and talked to members to compile the information.*

Among the many posters on a campus bulletin board is a printed sheet proclaiming "Don't Live Your Life a Lie—the Gay Community.

For most university students, this poster or a small weekly ad printed in The Review are the sum extent of their exposure to homosexuality on campus. But for others, it is the beginning of an association with a group that offers a distinctly different perspective on human sexuality.

The Gay Community began in Newark as part of a nationwide movement organized in the late 1960's by homosexuals who sought acceptance of homosexuality as a normal way of life. According to a source who asked not to be named Delaware's chapter was started in 1970 by "Zachary Swarr and a number of other people who were concerned with the gay plight. At first it was a private organization that met in area homes, even though a majority of the members were affiliated with the university. Emphasis at that time," said the source, "was on self-discovery, awareness, and personal growth. We brought in speakers as well as university and community resource people to accomplish this."

The organization received official university recognition in 1972 by drafting a constitution and obtaining a faculty sponsor. According to the present faculty advisor,

Richard Aumiller, director of the university theatre and summer arts festival, "after receiving university recognition, the group continued to meet in private homes because the members preferred the casual, informal atmosphere. But last year, we decided to meet on campus in order to serve those students who don't have transportation."

According to Aumiller, the Gay Community had difficulty finding appropriate space for campus meetings. "Classrooms seemed very cold and institutional," he said, "so eventually we turned to United Campus Ministry (UCM) who had a meeting house on W. Park Place." One of the pastors there agreed to the Gay Community's request and the group began meeting until their advertisements brought their presence to the attention of several congregations who support the UCM. The congregations threatened to withdraw their backing of the institution if gays were allowed to continue meeting there. "This placed the UCM in a very embarrassing spot," said Aumiller, "so they told us to find another place to meet."

Shortly thereafter, the group was approached by Warner Hall representatives, who offered the use of a study room in the basement. Now the meetings are held there every Sunday night at 8 p. m.

Between 30 and 40 gays were in attendance at each of the meetings this month, and the number seems to be increasing. "This is the most successful semester, in terms of interest and participation, since two years ago," said one gay. Another gay

added, "We started out this year with about ten people, and now it seems like we'll have to get a larger meeting room."

From all outward appearances, the group does not seem much different from any other group meeting on campus. Any pre-conceptions as to how gays usually look or dress are not borne out by the majority of those attending. Some of the members wear buttons celebrating their sexuality, (Gay is OK) or wear jewelry in the shape of the chemical symbol lambda which has been adopted as the gay movement insignia.

People in the Gay Community, like other minority groups, have developed a language of their own. For instance, a "Queen" is an effeminate man, "straights" are heterosexuals, and "cruising" means to go out looking for sex. In addition, much gay speech becomes a humorous satire on the attitude held about them by heterosexual society. Aumiller explained "a certain amount of sexual banter is normal. Minority groups tend to indulge themselves in a certain amount of friendly deprecatory humor as a release."

The organizational structure of the university Gay Community is "as anarchistic as possible," according to one of the leaders. By constitution, however, the group must have a faculty advisor and a program coordinator. The meeting begins with announcements of events, and then speakers, if present, are introduced to speak about the different aspects of the homosexual lifestyle. Subjects range from civil rights and solidarity in the face of police harassment, to literature and religion.

Last week, Dr. David Schulz, an ordained Episcopalian clergyman and professor of urban affairs here spoke on "A Christian Perspective on Human Sexuality." Despite doctrinal opposition from members of the Inter-Varsity Christian Fellowship (IVCF) who questioned whether his view could be called christian at all, Schulz maintained his position that "the only christian ethic is that of love, and . . . . therefore, homosexuality is a phenomenon of sexuality and not a peculiarity."

It is precisely this view of homosexuality that the Gay Community would like to promote as one of its chief goals. Many group members maintain the organization has shifted its emphasis somewhat since it began in 1970. "Originally our efforts were very much concerned with raising our own group consciousness," said Aumiller. "Now, since we have been fairly successful at that . . . our efforts are concentrated on raising the public's consciousness."

A university sophomore who is now the group's program coordinator and treasurer added, "As well as providing students with a sense of community, eventually we want to establish a prevailing attitude in our society that there is latitude for differences in personal lifestyle."